UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: SABINE OIL & GAS CORPORATION, et al.,

Debtors.

HPIP GONZALES HOLDING, LLC,

Appellant,

v.

SABINE OIL & GAS CORPORATION, et al.[1]

Appellees.

16 Civ. 4127 (JSR)
16 Civ. 4132 (JSR)

NORDHEIM EAGLE FORD GATHERING, LLC,

Appellant,

v.

SABINE OIL & GAS CORPORATION, et al.

Appellees.

16 Civ. 4615 (JSR)
16 Civ. 4616 (JSR)

**CONSOLIDATED BRIEF OF APPELLANTS**

---

[1] The debtors in these chapter 11 cases include: Sabine Oil & Gas Corporation; Giant Gas Gathering LLC; Sabine Bear Paw Basin LLC; Sabine East Texas Basin LLC; Sabine Mid-Continent Gathering LLC; Sabine Mid-Continent LLC; Sabine Oil & Gas Finance Corporation; Sabine South Texas Gathering LLC; Sabine South Texas LLC; and Sabine Williston Basin LLC.

Christopher Harris
Keith A. Simon
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864

*Attorneys for HPIP Gonzales Holdings, LLC*

Michael C. Hefter
Robert G. Burns
BRACEWELL LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
Telephone:  (212) 508-6100
Facsimile:  (800) 404-3970

William ("Trey") A. Wood (*pro hac vice*)
Yvonne Y. Ho (*pro hac vice*)
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile:  (713) 221-1212

*Attorneys for Nordheim Eagle Ford Gathering, LLC*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Civil Procedure 7.1(a) and Federal Rules of Bankruptcy Procedure 8012(b) and 8014, the undersigned counsel certify that:

1. The ultimate parent of Nordheim Eagle Ford Gathering, LLC is Cheniere Energy, Inc., a publicly-traded entity. Cheniere Energy, Inc. is also the ultimate parent of Cheniere Energy Partners, LP and Cheniere Energy Partners LP Holdings, LLC, both publicly-traded entities.

2. No publicly owned company owns HPIP Gonzales Holdings, LLC. Magnolia Infrastructure Partners, LLC owns 10% or more of HPIP Gonzales Holdings, LLC. Magnolia Infrastructure Holdings, LLC owns 10% or more of Magnolia Infrastructure Partners, LLC. ArcLight Energy Partners Fund V, L.P. owns 10% or more of Magnolia Infrastructure Holdings, LLC.

Respectfully submitted,

By: */s/ Michael C. Hefter*
      Michael C. Hefter
      *Attorney for Nordheim Eagle Ford Gathering, LLC*

By: */s/ Christopher Harris*
      Christopher Harris
      *Attorney for HPIP Gonzales Holdings, LLC*

# TABLE OF CONTENTS

*Page*

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT OF THE ISSUES...........................................................................1

INTRODUCTION ...........................................................................................2

STATEMENT OF THE CASE...............................................................................2

    A.    Sabine and Nordheim Entered into Gathering Agreements that Dedicated
    All of Sabine's Production from a Specified Parcel to Nordheim's
    Facilities...............................................................................................2

    B.    Sabine Conveyed the Nordheim Parcel and Pipeline Easement to
    Nordheim Pursuant to the Gathering Agreements ...................................3

    C.    Sabine Entered into Agreements with HPIP That Dedicated and
    Committed the Leases and All Production Produced and Saved to HPIP's
    Facilities...............................................................................................4

    D.    The Bankruptcy Court Authorized the Debtors to Reject the Agreements
    and Concluded that They Do Not Create Real Property Interests ...........5

SUMMARY OF THE ARGUMENT .........................................................................7

STANDARD OF APPELLATE REVIEW.................................................................8

ARGUMENT ...............................................................................................9

I.    This Court Should Reverse the Final Order Granting Sabine's Motion for
    Summary Judgment and Render Judgment against Sabine Because the Gathering
    Agreements Conveyed Real Property Interests .................................................9

    A.    The Bankruptcy Court Misapplied Texas Law in Erroneously Concluding
    that the Covenants Did Not Run with the Land......................................9

        1.    The Bankruptcy Court's Conclusion that the Covenants Do Not
        Touch and Concern the Land Is Logically and Legally Flawed...............10

            a.    The Covenants Alter Sabine's and Nordheim's Legal
            Relations Respecting the Interests .................................11

            b.    The Covenants Affect the Value of Sabine's Interests
            Independent of Collateral Circumstances ......................14

        2.    If Horizontal Privity-of-Estate is Required, the Requirement Is
        Satisfied...............................................................................15

a.      Texas Law Does Not Require Horizontal Privity—Only Vertical Privity ............................................................................16

b.      If Required, Horizontal Privity Was Established through the Transfer of the Pipeline Easement and the Nordheim Parcel..............................................................................................19

c.      Horizontal Privity Also Exists Because the Gathering Agreements Granted Nordheim a Profit à Prendre .......................21

B.      The Covenants Also Constitute Equitable Servitudes ...........................23

II.      The Bankruptcy Court Also Erred By Allowing Rejection of the Nordheim Gathering Agreements ........................................................................................24

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Refining Co. v. Tidal Western Oil Corp.*,
264 S.W. 335 (Tex. Civ. App.—Amarillo 1924), *writ ref'd*, 278 S.W. 1114
(1924) (per curiam) ..............................................................................12, 13, 22, 24

*Anderson v. Gipson*,
144 S.W.2d 948 (Tex. Civ. App.—Galveston 1940, no writ) ................................21

*Bagby v. Bredthauer*,
627 S.W.2d 190 (Tex. App.—Austin 1981, no writ)..............................................12

*Ball v. Rio Grande Canal Co.*,
256 S.W. 678 (Tex. Civ. App.—San Antonio 1923, writ ref'd)............................20

*In re Banning Lewis Ranch Co., LLC*,
532 B.R. 335 (Bankr. D. Colo. 2015) ...................................................................25

*Barnes S.W. Plaza, LLC v. WF Retail Invs. LLC*,
No. 02-11-00244-CV, 2012 WL 3758086 (Tex. App.—Fort Worth Aug. 30,
2012, no pet.) (mem. op.)......................................................................................18

*Brazos River Conserv. & Reclamation Dist. v. Adkisson*,
173 S.W.2d 294 (Tex. Civ. App.—Eastland 1943, writ ref'd) (Funderburk, J.
concurring)............................................................................................................21

*Butner v. United States*,
440 U.S. 48 (1979)..................................................................................................9

*Clear Lake Apartments v. Clear Lake Utilities Co.*,
537 S.W.2d 48 (Tex. Civ. App.—Houston [14th Dist.] 1976), *aff'd as
modified sub nom. Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549
S.W.2d 385 (Tex. 1977)....................................................................................19, 20

*Cummings v. Williams Prod.-Gulf Coast Co., L.P.*,
No. 4:06cv11, 2007 WL 172536 (E.D. Tex. Jan. 18, 2007)..................................22

*In re El Paso Refinery LP*,
302 F.3d 343 (5th Cir. 2002) ................................................................................15

*In re Energytec Inc.*,
739 F.3d 215 (5th Cir. 2013) .........................................................................9, 16, 21

*French v. Chevron U.S.A., Inc.*,
896 S.W.2d 795 (Tex. 1995)..................................................................................14

*Graham v. Omar Gasoline Co.*,
253 S.W. 896 (Tex. Civ. App.—Fort Worth 1923, no writ)....................................................22

*Harris Cnty. Flood Control Dist. v. Glenbrook Patiohome Owners Ass'n*,
933 S.W.2d 570 (Tex. App.—Houston [1st Dist.] 1996, writ denied)....................................18

*In re Helm*,
335 B.R. 528 (Bankr. S.D.N.Y. 2006)....................................................................................25

*Hinds v. Phillips Petro. Co.*,
591 P.2d 697 (Okla. 1979)......................................................................................................23

*Hunt v. Delcollo*,
317 A.2d 545 (Del. Ch. 1974)................................................................................................24

*Inwood N. Homeowners' Ass'n, Inc. v. Harris*,
736 S.W.2d 632 (Tex. 1987)..............................................................................................9, 18

*In re Ionosphere Clubs, Inc.*,
922 F.2d 984 (2d Cir. 1990)......................................................................................................8

*Lyle v. Jane Guinn Revocable Trust*,
365 S.W.3d 341 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)....................................18

*Miller v. Speed*,
248 S.W.2d 250 (Tex. Civ. App.—Eastland 1952, no writ)....................................................12

*In re Minges*,
602 F.2d 38 (2d Cir. 1979)......................................................................................................25

*Montfort v. Trek Resources, Inc.*,
198 S.W.3d 344 (Tex. App.—Eastland 2006, no pet.)......................................................13, 18

*In re Orion Pictures Corp.*,
4 F.3d 1095 (2d Cir. 1993)....................................................................................................6, 25

*Perry Homes v. Cull*,
258 S.W.3d 580 (Tex. 2008)...................................................................................................10

*Prochemco, Inc. v. Clajon Gas Co.*,
555 S.W.2d 189 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e).............................11, 13, 22

*Reagan Nat'l Advert. of Austin, Inc. v. Capital Outdoors, Inc.*,
96 S.W.3d 490 (Tex. App.—Austin 2002, pet. granted, judgm't vacated
w.r.m.)......................................................................................................................................23

*Sabine Prod. Co. v. Frost Nat. Bank of San Antonio*,
596 S.W.2d 271 (Tex. Civ. App.—Corpus Christi 1980, no writ).........................................12

*Simms v. S. Pipe Line Co.*,
    195 S.W. 283 (Tex. Civ. App.—Galveston 1917, writ ref'd)................................13

*Southwest Pipe Line Co. v. Empire Natural Gas Co.*,
    33 F.2d 248 (8th Cir. 1929) ..............................................................21, 22

*Stephens Cnty. v. Mid-Kansas Oil & Gas Co.*,
    254 S.W. 290 (Tex. 1923)................................................................11

*U.S. Pipeline Corp. v. Kinder*,
    609 S.W.2d 837 (Tex. Civ. App.—Fort Worth 1980, writ ref'd n.r.e.)..................12

*Wayne Harwell Properties v. Pan Am. Logistics Ctr., Inc.*,
    945 S.W.2d 216 (Tex. App.—San Antonio 1997), writ denied (Sept. 4, 1997)....................20

*Westland Oil Dev. Corp. v. Gulf Oil Corp.*,
    637 S.W.2d 903 (Tex. 1982)......................................9, 10, 11, 14, 15, 16, 17

*Wimberly v. Lone Star Gas Co.*,
    818 S.W.2d 868 (Tex. App.—Fort Worth 1991, writ denied)................................18

## Statutes

11 U.S.C. § 157 ................................................................................1

11 U.S.C. § 365(a) ................................................................1, 2, 8, 24

28 U.S.C. § 158(a)(1)................................................................................1

28 U.S.C. § 1334................................................................................1

Tex. Prop. Code § 13.002................................................................................10

Tex. Water Code § 36.002(a)................................................................................13

## Other Authorities

A. James Casner, *Cases and Text on Property*, 954-1063, 5th Edition (2004) ..............................19

Charles E. Clark, *The Doctrine of Privity of Estate in Connection with Real Covenants*, 32 Yale L.J. 123 (1922) ................................................................19

David A. Thomas, *How Far Does the Covenant Run? Covenants that Run with the Land in Oil and Gas Transactions*, 53 RMMLF-INST 19-1 § 19.04(5)(b)(i) (2007)................................................................18

Justice Holmes, *The Common Law* 355-56 (1881)................................................................19

2 Tiffany, Real Property § 1409 (2d ed. 1920) ................................................................19

3 Tiffany Real Property § 839 (3d ed. 1939) ................................................................21

**Rules**

Fed R. Bankr. P. 8001(a)...................................................................................................1

Fed. R. Bankr. P. 8013 ......................................................................................................8

**Treatises**

Black's Law Dictionary (10th ed. 2014)..............................................................15

Restatement (First) of Property § 534(a) (1936) .................................................21

Restatement (Third) of Property: Servitudes § 2.4 (2000) .................................19

## JURISDICTIONAL STATEMENT

The bankruptcy court had subject-matter jurisdiction over the underlying chapter 11 proceeding and the related adversary proceeding under 11 U.S.C. § 157 and 28 U.S.C. § 1334.[2] (Main Dkt. 1; Nord. Dkt. 1; HPIP Dkt. 1). On May 11, 2016, the bankruptcy court entered a final order in the chapter 11 proceeding, authorizing the rejection of certain contracts with Appellants Nordheim Eagle Ford Gathering, LLC ("**Nordheim**") and HPIP Gonzales Holdings, LLC ("**HPIP**"). (Main Dkt. 1082). The same day, the bankruptcy court entered a final order in the related adversary proceeding, granting Sabine and its related entities' (collectively, the "**Debtors**") motion for summary judgment on the declaratory judgment claims against Nordheim and HPIP and denying Nordheim's and HPIP's cross-motions for judgment on the pleadings. (Main Dkt. 1083 & 1084; Nord. Dkt. 22; HPIP Dkt. 23). Nordheim and HPIP timely filed notices of appeal from both orders on May 13, 2016 and May 24, 2016, respectively. (Main Dkt. 1098 & 1142; Nord. Dkt. 24; HPIP Dkt. 24). This Court has jurisdiction over these appeals pursuant to 28 U.S.C. § 158(a)(1) and Federal Rule of Bankruptcy Procedure 8001(a).

## STATEMENT OF THE ISSUES

1.  Whether the bankruptcy court erred as a matter of Texas law by failing to construe certain covenants in the parties' agreements, including Appellees' dedication and commitment of all gas and condensate produced and saved from a specified area of land to the performance of the agreements and assurance to pay certain fees, as covenants that run with the land that thereby conveyed real property interests to Appellants.

2.  Whether the bankruptcy court erred as a matter of Texas law by failing to construe these same covenants as creating equitable servitudes that burdened the real property interests of Appellees in favor of Appellants' land.

3.  As to Nordheim only, whether the bankruptcy court erred as a matter of law in allowing Appellees to reject the agreements under 11 U.S.C. § 365(a), if such agreements

---

[2] Filings in the record from the main chapter 11 proceeding, No. 15-11835, are cited by docket entry as "Main Dkt. [number]." Filings in the adversary proceedings against Nordheim Eagle Ford Gathering, LLC, No. 16-01043, and against HPIP Gonzales Holdings, LLC, No. 16-01042, are cited by docket entry as "Nord. Dkt. [number]" and "HPIP Dkt. [number]," respectively. Citations to the record are organized by docket number in the Appendix.

conveyed real property interests.[3]

## INTRODUCTION

These appeals challenge the bankruptcy court's erroneous rulings that have upset the oil and gas industry's commercial expectations through novel interpretations of Texas real-property law. The relevant question is: whether a party conveyed real property interests by dedicating and committing all hydrocarbons produced and saved from certain acreage to the counterparty's pipeline and gathering systems, and agreeing to pay a fee for the use of those systems. If these agreements are deemed to be either real covenants or equitable servitudes, the answer to that question is "Yes." A "no" answer will have broad disruptive ramifications for the Texas midstream industry, which regularly relies on this conveyance structure consistent with Texas law to protect long-term investments in developing the pipeline infrastructure indispensable to the gathering and transportation of oil and gas.

In this case, the bankruptcy court concluded that Sabine's covenants are merely personal, and do not create real property interests, such that a producer can abandon them in bankruptcy proceedings. This outcome contravenes controlling principles of Texas law, which provide that a dedication of hydrocarbons yet-to-be-produced, much like a royalty, conveys a real property interest that binds the transferor and its successors. By correctly applying the law, this Court should reverse the bankruptcy court's contrary orders.

## STATEMENT OF THE CASE

### A.    Sabine and Nordheim Entered into Gathering Agreements that Dedicated All of Sabine's Production from a Specified Parcel to Nordheim's Facilities

Nordheim and Sabine Oil and Gas Corporation ("**Sabine**")[4] are parties to two agreements: a Gas Gathering Agreement and a Condensate Gathering Agreement (collectively,

---

[3] HPIP also objected, arguing that the Debtors' attempt to use Section 365(a) to circumvent the covenants in the HPIP Agreements was improper. (*See* Main Dkt. 387).

the "**Gathering Agreements**"), both dated January 23, 2014. (Nord. Dkt. 21, Gath. Agmts. (sealed)). The Gathering Agreements concern gas and condensate produced in a "Dedicated Area" and attributable to "Interests" owned by Sabine's wholly-owned subsidiary, Sabine South Texas, LLC. (Nord. Dkt. 21, Gath. Agmts. § 1.1). The key provisions provide the following:

- Sabine "dedicate[d] for gathering and dehydration," and was required to deliver to Nordheim (at specified "Receipt Points"), "all gas and condensate produced and saved from wells ... located within the Dedicated Area ..., to the extent such [gas and condensate] is attributable to the Interests within the Dedicated Area now owned, leased or hereafter acquired by [Sabine] and/or its Affiliates" and their successors and assigns;

- in exchange for Nordheim's gathering and dehydrating the dedicated gas and condensate, at facilities constructed by Nordheim for this express purpose, Sabine covenanted to pay a monthly gathering fee and certain costs and expenses, and to make a deficiency payment if it fails to ship a minimum volume of gas or condensate during a yearly period;

- the Gathering Agreements are covenants "running with the Interests;"[5] and

- the Gathering Agreements are expressly binding on Sabine and its successors and assigns.

(Nord. Dkt. 21, Gath. Agmts. §§ 1.1, 1.9, 5.1).

### B. Sabine Conveyed the Nordheim Parcel and Pipeline Easement to Nordheim Pursuant to the Gathering Agreements

On March 11, 2014, Sabine and Nordheim executed Amendment No. 1 to the Gathering Agreements (the "**Amendment**"). The Amendment replaced Section 2.4 of the Gathering Agreements, which had provided that Sabine agreed to sell, convey, and assign to Nordheim the land needed for Nordheim to construct and operate a Gathering System. (Nord. Dkt. 21, Amendmt. at 1 (sealed)). The Amendment states that Sabine would execute and deliver to Nordheim a special warranty deed and an easement on March 11, 2014. (*Id.*).

---

[4] Sabine is the successor-in-interest to Sabine Oil & Gas LLC, the original counterparty to these agreements. (*See* Main Dkt. 371 at 3 n.3).

[5] Memoranda of the Gathering Agreements, which were filed in the real property records where the Interests are located and were signed by Sabine, confirm that the Gathering Agreements create binding covenants that run with the land. (Nord. Dkt. 5-4 & 5-5 ¶ 4).

Accordingly, Sabine conveyed to Nordheim a 17-acre tract of land (the "**Nordheim Parcel**") via special warranty deed (the "**Special Warranty Deed**"), and a right-of-way and pipeline and electrical easement (the "**Pipeline Easement**"). (Nord. Dkt. 5-7 & 5-8). The Pipeline Easement was conveyed "for the sole purpose" of constructing and maintaining pipelines to transport Sabine's gas and condensate and an electric line to provide power for the Gathering System.[6] (Nord. Dkt. 5-7 at 1).

In reliance on Sabine's dedication, Nordheim constructed a gas and condensate gathering system that commences at Receipt Points located on or adjoining the Dedicated Area and terminates at a specified delivery point. (Main Dkt. 387 at 4; Dkt. 21, Gath. Agmts. §§ 2.1, 3.1).

### C. Sabine Entered into Agreements with HPIP That Dedicated and Committed the Leases and All Production Produced and Saved to HPIP's Facilities[7]

HPIP and Sabine entered into two agreements governing the construction and operation of a gathering system by HPIP: (i) a *Production Gathering, Treating and Processing Agreement* between HPIP and Forest Oil Corporation[8] (the "**HPIP Gathering Agreement**") and (ii) a *Water and Acid Gas Handling Agreement* between HPIP and Forest Oil Corporation (the "**HPIP Handling Agreement**"[9] and, together with the HPIP Gathering Agreement, the "**HPIP Agreements**"). (HPIP Dkt. 8, Exs. 1, 2).

---

[6] The Special Warranty Deed and Pipeline Easement were filed in the real property records. (Nord. Dkt. 5-7, Ex. B at 3; Nord. Dkt. 5-8, Ex. A at 4).

[7] As discussed below, due to certain language and factual differences between the HPIP Agreements and the Nordheim Gathering Agreements, HPIP has filed a separate brief contemporaneously herewith (the "HPIP Brief").

[8] Forest Oil Corporation was renamed Sabine Oil & Gas Corporation on or about December 19, 2014.

[9] The HPIP Handling Agreement contains substantially similar language to the HPIP Gathering Agreement with respect to covenants running with the land. For the convenience of the Court, this Consolidated Brief focuses only on the HPIP Gathering Agreement.

Pursuant to the HPIP Gathering Agreement, HPIP agreed to construct, at its own expense, certain Facilities (as defined in the HPIP Gathering Agreement) to Sabine's specifications, and then to utilize those Facilities to perform gathering services with respect to all of the oil, gas, and water produced by Sabine from the HPIP Dedicated Area (as defined in the HPIP Gathering Agreement) during the term of the HPIP Gathering Agreement. The HPIP Gathering Agreement expressly provides that HPIP shall own the Facilities that it constructs. (HPIP Dkt. 8, HPIP Gath. Agmt. § 3.1). [10]

The key provisions of the HPIP Gathering Agreement state as follows:

- Sabine "dedicates and commits to the performance of this Agreement the Leases and all of [Sabine]'s owned or controlled Production produced and saved from [Sabine's] operated Wells located on the Leases" (the "Acreage Dedications") and is required to deliver the same to HPIP.

- The Acreage Dedications and the HPIP Gathering Agreement "constitute a real right and covenant running with the lands and leasehold interests."

- The HPIP Gathering Agreement is binding on the parties and their "successors, assigns, heirs, administrators and/or executors."

- The HPIP Gathering Agreement is binding on any purchaser of Sabine's leases and Sabine is prohibited from transferring the leases or any interests therein unless the purchaser assumes the HPIP Gathering Agreement.

- The HPIP Gathering Agreement was properly recorded in Wilson County, Texas and Gonzales County, Texas.

(HPIP Dkt. 8, HPIP Gath. Agmt. §§ 1.2, 9.2.1, 9.2.2; HPIP Dkt. 8, Ex. 3).

**D.** **The Bankruptcy Court Authorized the Debtors to Reject the Agreements and Concluded that They Do Not Create Real Property Interests**

---

[10] Due to various disputes between Sabine and HPIP, construction of the Facilities contemplated by the HPIP Gathering Agreement has been halted. The parties are arbitrating these disputes in a proceeding before the American Arbitration Association under the caption HPIP Gonzales Holdings, LLC v. Forest Oil Corporation, Case #01-14-0001-9347.

In July 2015, the Debtors filed petitions in bankruptcy under chapter 11. (Main Dkt. 1). In September 2015, the Debtors sought authorization to reject the Gathering Agreements and the HPIP Agreements (collectively, the "**Agreements**"). (Main Dkt. 371). On March 8, 2016, the bankruptcy court issued a bench decision authorizing Sabine to reject the Agreements (the "**Rejection Decision**"). But the decision reached only non-binding conclusions that the covenants do not run with the land. (Main Dkt. 872); *see In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993).

Thereafter, the parties sought a definitive ruling on the proper characterization of the covenants by asserting claims and counter-claims for declaratory relief in an adversary proceeding. (Nord. Dkt. 1 & 5; HPIP Dkt. 1 & 8). Nordheim and HPIP filed motions for judgment on the pleadings, and the Debtors filed a cross-motion for summary judgment. (Nord. Dkt. 7-8, 10-11; HPIP Dkt. 9-10, 12-13). On May 3, 2016, the bankruptcy court issued a Memorandum Decision (the "**Adversary Decision**"), which (1) incorporated the bankruptcy court's reasoning in the Rejection Decision; (2) concluded that the covenants did not run with the land or constitute equitable servitudes; (3) denied Nordheim's and HPIP's motions for judgment; and (4) granted the Debtors' motion for summary judgment. (Nord. Dkt. 20; HPIP Dkt. 22).

On May 11, 2016, the bankruptcy court entered final orders in the adversary proceedings (Main Dkt. 1083 & 1084) (the "**Final Order**"), and a final order (the "**Rejection Order**") authorizing the Debtors' rejection of the Gathering Agreements and the HPIP Agreements (Main Dkt. 1082). Nordheim and HPIP timely filed notices of appeal on May 13 and 24, 2016, respectively. (Main Dkt. 1098 & 1142). Appellants sought certification of a direct appeal (Main Dkt. 1100 & 1143; Nord. Dkt. 25), which the bankruptcy court denied (Main Dkt. 1267; Nord. Dkt. 38; HPIP Dkt. 31). Nordheim also moved to stay both final orders pending appeal (Main Dkt. 1099; Nord. Dkt. 29), which the bankruptcy court denied (Main Dkt. 1267; Nord. Dkt. 38).

Sabine's covenants to dedicate the gas and condensate to Nordheim, deliver the gas and condensate to Nordheim's facilities, and pay certain gathering and minimum-volume commitment fees create real property interests that were conveyed to Nordheim. The overwhelming weight of Texas authority confirms that the bankruptcy court erred in finding that these covenants do not run with the land or constitute equitable servitudes. Although the bankruptcy court noted that there was no applicable decision of the Texas Supreme Court on some of these issues, the court nonetheless substituted its own judgment for that of Texas courts on controlling principles of Texas law.

First, the bankruptcy court incorrectly held that the covenants are not real covenants that run with the land. By dedicating and requiring Sabine to deliver to Nordheim's facilities "all Gas [and condensate] produced and saved … attributable to the Interests," the covenants touch and concern the land by burdening gas and condensate yet to be produced. This is a classic example of a burden on real property, not personal property. The bankruptcy court clearly erred in determining, without citation, that the dedications "indisputably constitute personal property, not real property." (*See* Adversary Decision at 9; Nord. Dkt. 20; HPIP Dkt. 22).

Further, the Texas Supreme Court has not required horizontal privity in order for covenants to run with the land. Even if it did, however, horizontal privity exists here. Sabine's conveyances of the Pipeline Easement and Nordheim Parcel were made to effectuate the Gathering Agreements. Additionally, Sabine granted Nordheim a profit à prendre—a real property interest consisting of the right to remove minerals from Sabine's land.

---

[11] Because of certain language and factual differences between the Nordheim Gathering Agreements and the HPIP Agreements, the remainder of this brief will apply the applicable law to the Nordheim Agreements. HPIP has filed the separate HPIP brief, which applies the applicable law to the HPIP Agreements.

Second, the covenants also constitute equitable servitudes. By dedicating to the Gathering Agreements all gas and condensate produced and saved from the specified area and attributable to Sabine's interests, and covenanting to deliver the gas and condensate to Nordheim's gathering system, Sabine limited its ownership right in, and thus burdened those interests. These covenants correspondingly benefitted Nordheim's Pipeline Easement and the Nordheim Parcel, which were conveyed for the sole purpose of enabling the gathering and dehydration of Sabine's gas and condensate. This Court should hold that these covenants both run with the land and are equitable servitudes, and thus are real property interests binding on Sabine's successors.

Third, the proper characterization of these covenants warrants reversal of the Rejection Order. Rejection of the Gathering Agreements is not a reasonable exercise of business judgment because it has no effect on the real property interests that Sabine conveyed. Both the Final Order and Rejection Order should be reversed.

## STANDARD OF APPELLATE REVIEW

This Court reviews the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. FED. R. BANKR. P. 8013; *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir. 1990). Here, the bankruptcy court misconstrued and misapplied Texas law to conclude that the parties' agreements did not contain real covenants that run with the land or constitute equitable servitudes. These are purely legal determinations reviewed *de novo*. The bankruptcy court's separate decision authorizing the Debtors' rejection of these agreements under 11 U.S.C. § 365(a) also presents a question of law. On this issue, the bankruptcy court erred in concluding that a debtor can reasonably reject agreements even if they conveyed real property interests which survive any attempt to reject them, such that the rejection has no effect. This determination is likewise reviewed *de novo*.

<u>**ARGUMENT**</u>

I.     **This Court Should Reverse the Final Order Granting Sabine's Motion for Summary Judgment and Render Judgment against Sabine Because the Gathering Agreements Conveyed Real Property Interests**

In determining that the covenants in Nordheim's Gathering Agreements do not run with the land and do not create equitable servitudes, the bankruptcy court not only misapplied Texas law, but substituted a set of principles and new law wholly inconsistent with controlling Texas authority. Under both the common law and Texas law, real covenants that run with the land or amount to equitable servitudes convey interests in real property. Bankruptcy law, in turn, holds that real covenants survive any attempt to disavow them. Thus, while the fact that the Gathering Agreements conveyed real property interests to Nordheim underscores why the business-judgment rule precluded Sabine from rejecting them, *see infra* Part II, that rejection ultimately has no effect on the real property interests that Nordheim received. Because the Gathering Agreements conveyed real property interests, the Final Order should be reversed.

A.     **The Bankruptcy Court Misapplied Texas Law in Erroneously Concluding that the Covenants Did Not Run with the Land**

The Texas Supreme Court has held that a covenant runs with the land when it (1) touches and concerns the land; (2) relates to a thing in existence or specifically binds the parties and their assigns; (3) is intended by the original parties to run with the land; (4) the successor to the burden has notice; and (5) there is vertical privity of estate. *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987); *see also In re Energytec Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (applying Texas law); *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910-11 (Tex. 1982). [12]

---

[12] When determining the nature of an interest in property, bankruptcy courts must look to state law. *See Butner v. United States*, 440 U.S. 48 (1979) ("Property interests are created and defined by state law."). Here, the parties agreed that Texas law controls. (Main Dkt. 872 at 12).

Here, all five of the Texas Supreme Court's factors are clearly met. In the bankruptcy court, it was undisputed that the covenants relate to a thing in existence—Sabine's property—and that the Gathering Agreements explicitly state they were binding on the Debtors' successors and assigns (second factor). Nordheim's proper recordation of memoranda of the Gathering Agreements in the appropriate real-property records also conclusively provided notice to all parties (fourth factor). (Nord. Dkt. 5-4 & 5-5); TEX. PROP. CODE § 13.002.

Significantly, the Gathering Agreements, as well as the filed Memoranda, provide (under the third factor) that the Gathering Agreements "shall be … covenant[s] running with the Interests now owned or hereafter acquired by [Sabine]." (Nord. Dkt. 21, Gath. Agmts. § 1.6; Nord. Dkt. 5-4 & 5.5). *See Perry Homes v. Cull*, 258 S.W.3d 580, 606 (Tex. 2008) (stating that language used in the agreements provides the "primary evidence" of intent). Contrary to the parties' express intent, and in derogation of it, the bankruptcy court nevertheless determined that the covenants did not run with the land based on (1) the flawed analysis that the covenants do not "touch and concern" the land (first factor); and (2) the meritless conclusion that the "privity of estate" requirement was not satisfied (fifth factor). (Main Dkt. 872 at 12-18; Nord. Dkt. 20 at 7-16). These conclusions contravene Texas law and should be rejected.

### 1.	The Bankruptcy Court's Conclusion that the Covenants Do Not Touch and Concern the Land Is Logically and Legally Flawed

The bankruptcy court misapplied the two alternate variations of the touch-and-concern test under Texas law. (Main Dkt. 872 at 14-17; Nord. Dkt. 20 at 8-11). First, "a covenant will run if it affect[s] the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affect[s] the mode of enjoying it." *Westland*, 637 S.W.2d at 911. Second, "[i]f the promisor's legal relations in respect to the land in question are lessened—his legal interest as owner rendered less valuable by the promise—the burden of the covenant touches or concerns that land; if the promisee's legal relations in respect to that land are increased—his

legal interest as owner rendered more valu[able] by the promise—the benefit of the covenant touches or concerns the land." *Id.* While these tests "are far from absolute," *id.*, the bankruptcy court wrongly determined that neither were met.

        **a.**     **The Covenants Alter Sabine's and Nordheim's Legal Relations Respecting the Interests**

The bankruptcy court's erroneous conclusion that the covenants do not alter the parties' legal relations with respect to the land—the second of the two alternative "touch and concern" tests—turns on its flawed legal conclusion that the covenants concern only personal, not real property. (Main Dkt. 872 at 15). Texas law says the opposite.

Under the Gathering Agreements, Sabine burdened the Interests[13] by dedicating the gas and condensate to the Gathering Agreements and covenanting to deliver the gas and condensate to Nordheim's gathering system. "Ownership of … gas and oil in place [means] having the exclusive right to possess, use, and dispose of the gas and oil." *Stephens Cnty. v. Mid-Kansas Oil & Gas Co.*, 254 S.W. 290, 292 (Tex. 1923). By covenanting that all gas and condensate produced and saved in the Dedicated Area and attributable to the Interests will be subject to the Gathering Agreements, Sabine directly "affected the mode of enjoying" the Interests by altering its right to use and dispose of its gas and condensate. *Westland*, 637 S.W.2d at 911; *see also Prochemco, Inc. v. Clajon Gas Co.*, 555 S.W.2d 189, 191 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e) (covenant to "furnish gas" ran with the land). At the same time, the covenants have added value to the Interests by providing a means of moving the gas to market. And Nordheim's legal interest in the Interests has been rendered more valuable, having gone from having no interest at all to possessing the exclusive right to gather the gas and condensate.

---

[13] The "Interests" are defined to include "any right, title, or interest in lands and the right to produce oil and/or gas therefrom." (Nord. Dkt. 21, Ex. A to Gas Gath. Agmt. § 1.28; *id.*, Ex. A to Cond. Gath. Agmt. § 1.24).

The bankruptcy court misconstrued the covenants as burdening only gas and condensate after their extraction. (Main Dkt. 872 at 15; Nord. Dkt. 20 at 9-10). By their express terms, the covenants dedicate to Nordheim gas and condensate that remain in the ground, *i.e.*, "all [gas and condensate] produced and saved … attributable to the Interests within the Dedicated Area." (Dkt. 21, Gath. Agmts. § 1.1(1)). This dedicated gas and condensate "that has not been produced and is in place in the ground is realty." *U.S. Pipeline Corp. v. Kinder*, 609 S.W.2d 837, 840 (Tex. Civ. App.—Fort Worth 1980, writ ref'd n.r.e.). For example, the language "1/24 of all oil, gas and other minerals *produced, saved* and made available for market" is an "unambiguous" reservation of a royalty interest. *Miller v. Speed*, 248 S.W.2d 250, 256 (Tex. Civ. App.—Eastland 1952, no writ) (emphasis added). "A royalty in minerals is an interest in land." *Sabine Prod. Co. v. Frost Nat. Bank of San Antonio*, 596 S.W.2d 271, 276 (Tex. Civ. App.—Corpus Christi 1980, no writ). The "[gas and condensate] produced and saved" in Sabine's covenants here is no different. Just as a royalty—"a right to [a] specified proportionate share of production once the minerals are produced"—is an interest in minerals in place and thus realty, *Bagby v. Bredthauer*, 627 S.W.2d 190, 194 (Tex. App.—Austin 1981, no writ), Nordheim's right to the gas from Sabine's wells once produced is a real property interest in minerals in place.

This issue was squarely addressed in *American Refining Co. v. Tidal Western Oil Corp.*, where the agreement at issue provided for the furnishing of "all of the … gas coming from the oil wells … which may be produced." 264 S.W. 335, 336 (Tex. Civ. App.—Amarillo 1924), *writ ref'd*, 278 S.W. 1114, 1114 (1924) (per curiam). The covenantor contended that the gas "is personalty rather than realty," such that "the contract created no covenant running with the land." *Id.* at 338. The court disagreed, since "[i]t is settled law in Texas that oil and gas are minerals, and while in place are a part of the realty, and one who acquires an interest in them by proper conveyance has a legal estate and interest in the land under which they are situated." *Id.* The

covenants in *American Refining* were "real rather than personal covenants, because at the time the contract was made it had for its object gas which was then inherent in and a part of the land itself." *Id.*; *see also Simms v. S. Pipe Line Co.*, 195 S.W. 283, 288 (Tex. Civ. App.—Galveston 1917, writ ref'd) (purchaser aware of contracts providing that oil produced from the property "should be sold and delivered" to the plaintiff at a specified price "would be bound by such contracts").

The law that was settled by 1924 has not changed. In *Prochemco*, the court held that a contract to furnish yet-to-be-produced gas for a certain price was a covenant running with the land. 555 S.W.2d at 191. Similarly, in *Montfort v. Trek Resources, Inc.*, the court found that a covenant by the owner of underground water rights to furnish fresh water touched and concerned the land.[14] 198 S.W.3d 344, 355 (Tex. App.—Eastland 2006, no pet.).

The bankruptcy court tried to distinguish these authorities in two ways. Most broadly, the court stated that "Texas law does not hold that <u>all</u> rights and obligations relating to minerals yet to be produced necessarily create rights and obligations relating to real property." (Nord. Dkt. 20 at 9 (emphasis in original)). This is facially illogical and legally flawed. Texas law holds that minerals yet to be produced are real property. Accordingly, if something is real property, then a right relating to that thing necessarily "relate[s] to real property."

The bankruptcy court also fixated on meaningless factual differences between the Gathering Agreements here and the contract in *American Refining*. (*Id.* at 9-10). First, the court pointed to Sabine's reservation of the right to operate its Interests free from Nordheim's control. That provision has no legal impact on whether the gas and condensate *underlying* the Interests are burdened by the covenants. Even royalty interests, which undisputedly are real property

---

[14] Water, like oil and gas, is considered real property when underground. *See* Tex. Water Code § 36.002(a) ("[A] landowner owns the groundwater below the surface of the landowner's land as real property.").

interests, (*id.* at 8 n.33), are separate and distinct from—and thus cannot interfere with—the right to operate the mineral estate. *See, e.g.*, *French v. Chevron U.S.A., Inc.*, 896 S.W.2d 795, 798 (Tex. 1995) (conveyance of royalty reserved other rights).

Second, the court noted that the Receipt Points for the gas and condensate are not located at the well itself (Nord. Dkt. 20 at 10), but no authority suggests that this fact has any bearing on whether Nordheim's right to receive and transport the hydrocarbon products is a real property interest. Moreover, the bankruptcy court's reasoning in this regard is belied by the undisputed fact that the Receipt Points are located on or adjoining the leases whose production is dedicated to Nordheim's facilities, and the Receipt Points are themselves connected to Sabine's wells. (*See* Nord. Dkt. 21, Exs. C & G to Gath. Agmts.).

Third, the bankruptcy court observed that Sabine's obligation to pay Nordheim a gathering fee is triggered by the receipt of gas and condensate, rather than their extraction. (Nord. Dkt. 20 at 10). That is factually incorrect because Sabine also had minimum volume commitments. Either way, Sabine agreed to dedicate all gas and condensate produced and saved from the Dedicated Area solely to Nordheim's facilities. None of these other provisions detract from the proper legal conclusion that Sabine burdened its real property interests by covenanting to deliver yet-to-be-produced minerals to Nordheim. The bankruptcy court's decision to the contrary is in error.

**b. The Covenants Affect the Value of Sabine's Interests Independent of Collateral Circumstances**

For similar reasons, the covenants also satisfy the first formulation of the touch-and-concern test, which examines whether a covenant affects the value of the promisor's property interest "independently of collateral circumstances," or affects the "mode of enjoying it." *Westland*, 637 S.W.2d at 911. The Gathering Agreements plainly impact the value of Sabine's interests. The dedication clauses and gathering fees make those interests more or less valuable,

depending on the price of hydrocarbons and the market rates for gathering at a particular time. This fact alone establishes that the covenants touch and concern the land.

The bankruptcy court misplaced reliance on the Fifth Circuit's non-binding suggestion that, to run with the land, a covenant must impact the owner's use of the land in addition to affecting its value. (Main Dkt. 872 at 14 (quoting *In re El Paso Refinery LP*, 302 F.3d 343, 357 (5th Cir. 2002)). This position ignores the Texas Supreme Court's articulation of a disjunctive test, under which *either* an impact on value *or* an impact on the enjoyment of the land is sufficient. *See Westland*, 673 S.W.2d at 911. In any event, the covenants also burden Sabine's use of the property by dedicating gas and condensate in the ground to Nordheim's facilities. *See supra* at 11-12. Regardless of which test applies, these covenants touch and concern the land.[15]

> **2.    If Horizontal Privity-of-Estate is Required, the Requirement Is Satisfied**

The bankruptcy court compounded its errors when analyzing the privity-of-estate requirement, both by suggesting that Texas law requires horizontal privity—as opposed to vertical privity—and concluding that horizontal privity is lacking here. Privity of estate is "[a] mutual or successive relationship to the same right in property, as between grantor and grantee or landlord and tenant." BLACK'S LAW DICTIONARY (10th ed. 2014). There are two types of privity—"horizontal privity," which is the relationship between "the original parties to the

---

[15] The bankruptcy court found it significant that the property subject to the Gathering Agreements was subject to liens by the Debtors' secured creditors. (Main Dkt. 872 at 17). The credit agreement, however, specifically authorized encumbrances such as those found in the Gathering Agreements. (*See* Nord. Dkt. 5-6 at 15-16, subparts (b) & (f) (defining "Excepted Liens" to include (1) liens "which arise in the ordinary course of business under … contracts for the sale, transportation or exchange of oil and natural gas, … processing agreements, … and other agreements which are usual and customary in the oil and gas business," and (2) easements, covenants, and similar encumbrances on the property)). This inclusion of "easements" and "similar encumbrances on the property" rights that inherently touch and concern the land as types of excepted liens negates the bankruptcy court's conclusion that the credit agreements prohibit conveyances of that touch and concern the land. (*Compare* Nord. Dkt. 20 at 11 (citing Nord. Dkt. 5-9, art. I(d) & (f)), *with* Nord. Dkt. 5-9 at 16, subpart (f)).

covenant," and "vertical privity," which exists between one of the original parties and an assignee or successor. *In re Energytec, Inc.*, 739 F.3d at 222.

Here, there is successive (vertical) privity between Sabine Oil and Gas LLC, the original counterparty to the Gathering Agreements, and Sabine. (*See* Main Dkt. 371 at 3 n.3). That is enough to satisfy the privity-of-estate requirement.[16] And if horizontal privity were also required, it exists in this case because (1) the Pipeline Easement and Nordheim Parcel were conveyed to effectuate the Gathering Agreements; and (2) through the Gathering Agreements, Sabine conveyed to Nordheim a profit à prendre.

### a. Texas Law Does Not Require Horizontal Privity—Only Vertical Privity

The bankruptcy court conceded "there is some ambiguity" as to whether Texas law requires horizontal privity, but refused to recognize that Texas courts have abandoned it. (Nord. Dkt. 20 at 12). In *Westland*, however, the Texas Supreme Court held that a covenant ran with the land despite there being no horizontal privity. In that case, Mobil Oil Corporation entered into a farmout agreement with Westland Oil Development Corporation ("**Westland**") covering certain leases owned by Mobil. *Westland*, 637 S.W.2d at 905. Under the agreement, once Westland completed its drilling operations, it would receive half of Mobil's interest in the leases. In November 1966, Chambers & Kennedy ("**C&K**") entered into a letter agreement assuming Westland's obligations under the farmout agreement. *Id.* The letter agreement contained an "area of mutual interest agreement." *Id.* This particular agreement covered any "leasehold

---

[16] Sabine contended that vertical privity was lacking because the leases in the Dedicated Area are owned by Sabine South Texas LLC, who is not a party to the Gathering Agreements, and not Sabine. This argument miscomprehends vertical privity. Vertical privity means privity between the original parties to the covenant and the present disputants. *In re Energytec, Inc.*, 739 F.3d at 222. Here, there is successive privity between Sabine Oil and Gas LLC, the original counterparty to the Gathering Agreements, and Sabine, which satisfies the privity requirement.

interests" acquired by the parties that affect any of the lands covered by the farmout agreement. *Id.*

In March 1968, C&K executed an operating agreement with Mobil which provided, *inter alia,* that the parties' interests were subject to the terms in the farmout and letter agreements. *Id.* at 906. Pursuant to the farmout, Mobil conveyed the leasehold interests to C&K. *Id.* at 905.

In April 1972, Mobil entered into a farmout agreement with Bernard Hanson which stated that the agreement covered lands also covered by the 1968 operating agreement, and that all interests earned by Hanson from Mobil under the farmout would be subject to that agreement. *Id.* at 906. Hanson also entered into a farmout agreement with C&K covering the interests earned under the Mobil/Westland farmout. *Id.* at 907. Hanson later assigned these farmout agreements to Gulf Oil Corporation and the Superior Oil Company. *Id.*

Gulf and Superior drilled a test well and were assigned leases by Mobil. *Id.* Thus, Gulf and Superior acquired their interests in the leases from two sources: (1) Mobil via Hanson and (2) C&K via Hanson. Westland then filed suit to enforce the provisions of the C&K letter agreement as to the leases Mobil assigned to Gulf and Superior. The only parties to the letter agreement were Westland and C&K, meaning that, to be binding on Gulf and Superior, the covenant had to run with the land.

No horizontal privity existed; C&K and Westland never had a "mutual or successive relationship" to the leases. Rather, the letter agreement provided only that C&K acquired Westland's farmout rights and obligations. The leases were not conveyed in the letter agreement, and Westland and C&K never shared an interest in the leases. Yet the court stated that "[p]rivity of estate exists ... by virtue of the assignment of [the leases] to Gulf and Superior." *Id.* at 911. In other words, privity of estate existed because the successor owners had received

their interests from an original party to the letter agreement. Horizontal privity was not addressed because vertical privity was sufficient.

More recently, the Texas Supreme Court again confirmed that horizontal privity is not required, holding that "the requirement of privity [was] satisfied" "[b]ecause the property in question was conveyed in a succession of fee simple estates." *Inwood*, 736 S.W.2d at 635. The existence of vertical privity was enough for the covenant to run with the land.

Consistent with *Inwood* and *Westland*, lower Texas courts have similarly dispensed with a horizontal privity requirement. For example, in *Wimberly v. Lone Star Gas Co.*, a landowner agreed to sell water from her well to Lone Star, a gas company, for use in operating its compressor plant. 818 S.W.2d 868, 870 (Tex. App.—Fort Worth 1991, writ denied). The landowner did not convey any real property to Lone Star; she only allowed Lone Star to access wells and pipelines on her property. *Id.* at 869-70. The court rejected the argument that the subsequent purchasers were not bound to allow Lone Star to take water from the property, concluding that the promise touched and concerned the land. Without mentioning a horizontal privity requirement, the court said: "We see nothing in the contract that is inconsistent with the [S]upreme [C]ourt's definition of a contract running with the land." *Id.* at 870-71.

Other Texas courts have similarly analyzed whether covenants run with the land without considering horizontal privity.[17] Indeed, Texas's abandonment of the horizontal privity requirement comports with the national trend. *See* David A. Thomas, *How Far Does the*

---

[17] *See, e.g.*, *Barnes S.W. Plaza, LLC v. WF Retail Invs. LLC*, No. 02-11-00244-CV, 2012 WL 3758086, at *4 (Tex. App.—Fort Worth Aug. 30, 2012, no pet.) (mem. op.); *Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 353 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding privity requirement met because the parties succeeded to the rights of the original parties to the covenant); *Montfort*, 198 S.W.3d at 355 (holding that covenant ran with land without addressing horizontal privity); *Harris Cnty. Flood Control Dist. v. Glenbrook Patiohome Owners Ass'n*, 933 S.W.2d 570, 574-75 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (same).

*Covenant Run?  Covenants that Run with the Land in Oil and Gas Transactions*, 53 RMMLF-

INST 19-1 § 19.04(5)(b)(i) (2007) (noting that "little modern case law exhibits adoption of the

horizontal privity requirement").  In fact, the Restatement explicitly rejects horizontal privity as a

requirement, explaining that

> the horizontal-privity requirement serves no function beyond insuring that most
> covenants intended to run with the land will be created in conveyances.  Formal
> creation of covenants is desirable because it tends to assure that they will be
> recorded.  However, the horizontal-privity requirement is no longer needed for
> this purpose.  In modern law, the Statute of Frauds and recording acts perform
> that function.

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.4 (2000).  For these reasons, horizontal

privity should be irrelevant to whether the covenants here run with the land.[18]

> **b.      If Required, Horizontal Privity Was Established through the
> Transfer of the Pipeline Easement and the Nordheim Parcel**

Even if horizontal privity had been required, it was satisfied in two separate ways here:

through the conveyances of the Pipeline Easement and Nordheim Parcel pursuant to and for the

purpose of effectuating the Gathering Agreements.  The opinion in *Clear Lake Apartments v.

Clear Lake Utilities Co.*[19] is demonstrative.  537 S.W.2d 48 (Tex. Civ. App.—Houston [14th

---

[18] Indeed, the bankruptcy court's legally dubious assumption that it was merely following the
"traditional paradigm" in analyzing the horizontal privity requirement calls into question its
entire analysis of the issue.  The extensive legal scholarship published over the past several
centuries debating the historical foundation of the horizontal privity requirement—some theories
arguing that there is no historical justification for the requirement at all—belie the "traditional
paradigm" conceptualized by the court.  *See, e.g.*, Justice Holmes, The Common Law 355-56
(1881) ("Privity of estate, as used in connection with covenants at common law . . . is never
necessary between covenantor and covenantee . . . ."); Charles E. Clark, The Doctrine of Privity
of Estate in Connection with Real Covenants, 32 Yale L.J. 123 (1922) (arguing that privity of
estate between covenantor and covenantee is not a historically justified requirement); 2 Tiffany,
Real Property 1409 (2d ed. 1920) ("The exact basis for this requirement that the parties to the
covenant stand in the relation of grantor and grantee in order that the covenant may run, does not
clearly appear."); *see also* A. James Casner, Cases and Text on Property, 954-1063, 5th Edition
(2004).

[19] *Clear Lake*'s reliance on horizontal privity pre-dates *Westland* and *Inwood*.

Dist.] 1976), *aff'd as modified sub nom. Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385 (Tex. 1977). There, the court found that horizontal privity was lacking in a covenant to furnish sewer service. 537 S.W.2d at 51. The court distinguished the covenant from "irrigation contracts which create an easement in the property of the landowner, or in the real property (such as canals or levies) of the water supplier," which courts have found "transfer a sufficient interest in the land to create the necessary privity of estate." *Id.* (citing *Ball v. Rio Grande Canal Co.*, 256 S.W. 678, 682 (Tex. Civ. App.—San Antonio 1923, writ ref'd)).

In *Ball*, the court addressed a contract whereby an irrigation company agreed to furnish water for irrigation, and the covenantee agreed to pay a stipulated rate for the water. 256 S.W. at 679-80. The contract also granted the covenantee "an easement in favor of the [covenantee's] lands against the irrigation company properties," allowing the covenantee to receive water from the irrigation company's canal. *Id.* at 680, 682. On this basis, the court concluded that the contract "is a covenant created by mutual obligation running with the land of privity of estate" and was enforceable "against subsequent purchasers with notice." *Id.* The conveyed easement was "a sufficient interest in land to create the necessary privity of estate." 537 S.W.2d at 51.

Here, Sabine agreed to furnish gas and condensate that were, at the time of the agreement, still underground, just as the irrigation company agreed to furnish water that was underground. Like the parties in *Ball* did for the water, Sabine and Nordheim agreed to stipulated rates for the transfer of gas and condensate. And as in *Ball*, the covenantor, Sabine, conveyed an easement to the covenantee, Nordheim, to effectuate the agreement.

In short, horizontal privity merely requires that "the interest transferred ... convey the land involved, or an easement in the land." *See Wayne Harwell Properties v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997), writ denied (Sept. 4, 1997). The easement need not be transferred in the same conveyance as the covenants themselves, as

the bankruptcy court believed.  (Nord. Dkt. 20 at 13); *see also, e.g.*, *In re EnergyTec, Inc.*, 739 F.3d at 217, 223 (covenants were conveyed in separate document from conveyance of leases); RESTATEMENT (FIRST) OF PROPERTY § 534(a) (1936) (horizontal privity exists when "the transaction of which the promise is a part includes a transfer of an interest" in the land benefitted or burdened by the promise).  Sabine's conveyance of an easement in the land involved pursuant to and for the sole purpose of effectuating the Gathering Agreements establishes horizontal privity between the parties.

### c. Horizontal Privity Also Exists Because the Gathering Agreements Granted Nordheim a Profit à Prendre

Sabine's conveyance to Nordheim of a profit à prendre independently confirms that horizontal privity is satisfied.  The bankruptcy court stated that it would not address this argument—incorrectly asserting it was not raised in Nordheim's initial motion—but addressed its substance anyway.  (Nord. Dkt. 20 at 14 n.50).  In fact, Nordheim's motion for judgment on the pleadings discussed this very principle, including the same key authorities addressed below.  (Nord. Dkt. 8 at 21-23).  Hence, the issue was properly raised.

A profit à prendre involves "a power to acquire, by severance or removal from another's land, some thing or things previously constituting a part of the land, or appertaining thereto."  3 TIFFANY REAL PROPERTY § 839 (3d ed. 1939).  "A right to take oil or gas from land in which the person so entitled has no right of ownership is likewise, though not always expressly so stated, a right of profit a prendre."  *Brazos River Conserv. & Reclamation Dist. v. Adkisson*, 173 S.W.2d 294, 307 (Tex. Civ. App.—Eastland 1943, writ ref'd) (Funderburk, J. concurring).  Because a profit à prendre is a "an interest in the real estate," *Anderson v. Gipson*, 144 S.W.2d 948, 950 (Tex. Civ. App.—Galveston 1940, no writ), it is sufficient to establish horizontal privity.

*Southwest Pipe Line Co. v. Empire Natural Gas Co.* illustrates the point.  33 F.2d 248 (8th Cir. 1929) (applying Oklahoma law).  There, Empire Natural Gas Co. entered into a contract

to purchase gas from Revelle Oil Company that allowed it to go on the leasehold to construct a pipeline and connect it to the wells. *Empire*, 33 F.2d at 249-50. Revelle then assigned its lease to a company that, in turn, assigned it to Southwest Pipe Line, which disconnected the lines and took the gas. *Id.* Much like Sabine, Southwest contended that the contract was "simply an executory contract for the sale of personal property when produced." *Id.* The court disagreed because the contract "provided that [Empire] was to have an easement for installing and maintaining the meter and necessary equipment on the leasehold interest to handle the gas," which was "a right pertaining to the land itself." *Id.* at 252.

Significantly, the *Southwest Pipe Line* court explained that Empire had received "a profit a prendre; that is, a right in the nature of an easement appurtenant to an estate to enter upon land of another for various purposes, which would embrace taking natural gas therefrom." *Id.* By granting Empire the right "to go upon the land and place there the necessary structures to connect the wells ... with its system of pipe lines," the contract gave Empire "*some interest in the leasehold binding on the assignee thereof with notice.*" *Id.* (emphasis added).

*Empire* relied on the Texas decision in *Tidal*, which recognized the rule that "a covenant or condition which relates to the development of the mineral resources of lands in consideration of work to be done thereon, or upon a royalty basis, is a covenant which runs with the land." *Tidal*, 264 S.W. at 339; *see also Graham v. Omar Gasoline Co.*, 253 S.W. 896, 899 (Tex. Civ. App.—Fort Worth 1923, no writ) (agreement conferring right "to enter upon the land to lay pipes, install meters for the measurement of the gas, maintain vacuums on the oil wells" was the "grant of a profit à prendre, and imposed a servitude upon the property" binding on purchasers with notice). Consistent with that principle, courts have held that contracts to furnish gas run with the land. *See Prochemco*, 555 S.W.2d at 190 (covenant to buy and sell natural gas for irrigation purposes ran with the land); *see also, e.g.*, *Cummings v. Williams Prod.-Gulf Coast*

*Co., L.P.*, No. 4:06cv11, 2007 WL 172536, at *4 (E.D. Tex. Jan. 18, 2007) ("A contract to purchase gas imposes a servitude on the property of the subsequent purchaser who has full notice of such servitude."); *Hinds v. Phillips Petro. Co.*, 591 P.2d 697, 699 (Okla. 1979) (relying on *Empire* to hold a contract transferred an easement and a profit à prendre).

The bankruptcy court missed the point of these cases by saying that "none of Nordheim or HPIP's structures connects to Sabine's wells themselves, and neither Nordheim nor HPIP has the right to connect its pipelines to the Debtors' wells." (Nord. Dkt. 20 at 14). Just like the contract in *Empire* "gave the right to appellee to go upon the land and place there the necessary structures to connect the wells of the Revelle Company with its system of pipe lines," here the Gathering Agreements authorized Nordheim to connect its system of pipe lines with Sabine's wells through Receipt Points located on or immediately adjoining Sabine's property. (Nord. Dkt. 21, Gath. Agmts. §§ 2.1, 3.1; *id.*, Exs. B & G to Gath. Agmts.). The Gathering Agreements provide that, once extracted, Sabine's gas and condensate can go nowhere but into Nordheim's Gathering System. That the gas and condensate passed through Receipt Points on its way to Nordheim's gathering system does not alter the nature of the conveyance as a profit à prendre.

### B. The Covenants Also Constitute Equitable Servitudes

The bankruptcy court also erroneously concluded that the covenants did not convey real property interests in the form of equitable servitudes. Even if a covenant does not run with the land, it will "still bind successors to the burdened land as an equitable servitude if: (1) the successor to the burdened land took its interest with notice of the restriction; (2) the covenant limits the use of the burdened land; and (3) the covenant benefits the land of the party seeking to enforce it." *Reagan Nat'l Advert. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.).

Regarding the first element, as discussed above, any successors to the Interests will take their interest with notice of the Covenants because memoranda of the Gathering Agreements were recorded. *See supra* at 5. As for the second element, the above analysis regarding the touch-and-concern requirement demonstrates that the covenants limit Sabine's use of the Interests by burdening its use and disposition of its gas and condensate. *See supra* at 11-12.

As for the third element of an equitable servitude, the covenants benefit Nordheim's land in several ways. The covenants not only benefit the Pipeline Easement by allowing it to serve its express sole purpose of "transport[ing] oil, natural gas or water or their constituent products," (Nord. Dkt. 5-7 at 1), but are "necessary to [the pipeline's] operation." *Tidal*, 264 S.W. at 335. Likewise, the covenants benefit Nordheim's interest in the Nordheim Parcel, which was conveyed to further the development and construction of Nordheim's gathering systems. (Nord. Dkt. 21, Amendmt, at 1). The benefit here is stronger than in other cases in which the requisite benefit has been found. *See, e.g.*, *Hunt v. Delcollo*, 317 A.2d 545, 550 (Del. Ch. 1974) (covenant to build roads between other lots benefited plaintiff's lot because these roads decreased traffic in front of plaintiff's lot). Thus, even if the covenants do not run with the land, they still constitute equitable servitudes. For this additional reason, this Court should reverse the Final Order.

## II. The Bankruptcy Court Also Erred By Allowing Rejection of the Nordheim Gathering Agreements

Because the covenants in the Gathering Agreements create real property interests, the bankruptcy court's separate Rejection Order (Main Dkt. 1082)—which reached only tentative, not final, conclusions about how these covenants should be characterized—has no impact on Sabine's continuing obligation to abide by the covenants. Even the bankruptcy court recognized that Sabine remains bound to the covenants if they run with the land or constitute equitable servitudes, regardless of whether the Gathering Agreements are rejected under 11 U.S.C. § 365(a). (Main Dkt. 872 at 8).

But given that covenants *do* run with the land, the bankruptcy court should have barred the Debtors from rejecting the Gathering Agreements in the first place. When reviewing a debtor's decision to reject an executory contract, courts "should examine the contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to reject it. *In re Orion Pictures Corp.*, 4 F.3d at 1099 (citing *In re Minges*, 602 F.2d 38 (2d Cir. 1979)). "The business judgment rule requires the Court to determine whether a reasonable business person would make a similar decision under similar circumstances." *In re Helm*, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006).

Here, Sabine cannot meet the business judgment standard. Rejection of the Gathering Agreements would not benefit Sabine's estate because the covenants are real property interests that survive rejection. *See In re Banning Lewis Ranch Co., LLC*, 532 B.R. 335, 345-46 (Bankr. D. Colo. 2015) (explaining that because "the Agreements are of the type that run with the land and are properly recorded" and were "binding on the Debtor's successors in interest, … the Debtor's rejecting the Agreements would serve no purpose at all"). The bankruptcy court thus erred in concluding that Sabine's decision to reject the Gathering Agreements comported with the business judgment standard. The Rejection Order should be reversed.

## CONCLUSION

For these reasons, Appellants respectfully request that this Court reverse both the bankruptcy court's May 11, 2016 Order granting Debtors' motion for summary judgment in the adversary proceedings and denying Appellants' motions for judgment on the pleadings, and the May 11, 2016 Order authorizing Debtors' rejection of the underlying agreements. Appellants further request any additional relief to which they are justly entitled.

DATED:  July 22, 2016

Respectfully submitted,

B<small>RACEWELL</small> LLP

By: */s/ Michael C. Hefter*
      Michael C. Hefter
      Michael.Hefter@bracewelllaw.com
      Robert G. Burns
      Robert.Burns@bracewelllaw.com
      1251 Avenue of Americas, 49th Floor
      New York, New York 10020-1104
      Telephone: (212) 508-6100
      Facsimile:  (800) 404-3970

      William A. ("Trey") Wood III (*pro hac vice*)
      Trey.Wood@bracewelllaw.com
      Yvonne Y. Ho (*pro hac vice*)
      Yvonne.Ho @bracewelllaw.com
      711 Louisiana Street, Suite 2300
      Houston, Texas 77002
      Telephone: (713) 223-2300
      Facsimile:  (713) 221-1212

*Attorneys for Nordheim Eagle Ford Gathering, LLC*

L<small>ATHAM</small> & W<small>ATKINS</small> LLP

By: */s/ Christopher Harris*
      Christopher Harris
      Christopher.Harris@lw.com
      Keith A. Simon
      Keith.Simon@lw.com
      885 Third Avenue
      New York, New York 10020
      Telephone: (212) 906-1200
      Facsimile:  (212) 751-4864

*Attorneys for HPIP Gonzales Holdings, LLC*

## CERTIFICATE OF SERVICE

I, Michael C. Hefter, hereby certify that on July 22, 2016, I caused the foregoing papers to be electronically filed with the Clerk of Court using the ECF system which will send electronic notices of same to all counsel of record.

DATED: July 22, 2016

**BRACEWELL LLP**

By: */s/ Michael C. Hefter*
    Michael C. Hefter

#5265674