IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>*Sabine Oil & Gas Corporation, et al*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-11835 (SCC)<br><br>(Jointly Administered) |
| HPIP GONZALES HOLDINGS, LLC,,<br><br>Appellant,<br><br>- vs -<br><br>SABINE OIL & GAS CORPORATION, et al,<br><br>Appellees, | 16 Civ. 4127 (JSR)<br><br>16 Civ. 4132 (JSR) |

**SABINE OIL & GAS CORPORATION'S OPPOSITION TO CONSOLIDATED BRIEF OF APPELLANTS NORDHEIM EAGLE FORD GATHERING, LLC AND HPIP GONZALES HOLDINGS, LLC AND TO BRIEF OF APPELLANT HPIP GONZALES HOLDINGS, LLC**

[1] The debtors in these chapter 11 cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, include: Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corporation (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440). The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana, Suite 1600, Houston, Texas 77002.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the undersigned counsel certifies that the only company that directly or indirectly owns 10% or more of any class of the Debtors' equity interests is Sabine Investor Holdings, LLC. Sabine Investor Holdings, LLC holds approximately 37% of Sabine Oil & Gas Corporation's common stock and 100% of its preferred stock.

Respectfully submitted,

*/s/ Ryan Blaine Bennett*
Ryan Blaine Bennett
*Attorney for Sabine Oil & Gas Corporation*

## TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 3

A. The HPIP Agreements ........ 4

B. The Nordheim Agreements ........ 5

ARGUMENT ........ 7

I. The Agreements Do Not Contain Covenants Running With The Land. ........ 8

A. There Is No Privity of Estate Between Sabine and the Objectors Because the Agreements Do Not Convey an Interest in Property. ........ 9

1. Horizontal Privity Is Required for a Covenant to Run with the Land under Texas Law ........ 10

2. Nordheim and HPIP Cannot Meet Their Burden to Establish Horizontal Privity ........ 14

a. The Agreements Do Not Grant Any Interest in Property, Real or Personal. ........ 15

b. The Real Property Interests Identified by Objectors Do Not Satisfy Horizontal Privity. ........ 20

i. The Agreements Do Not Convey Any Interest in the Mineral Estates ........ 20

ii. The Conveyance of the Nordheim Surface Parcel Does Not Satisfy the Horizontal-Privity Requirement. ........ 22

iii. The Conveyance of the Nordheim Pipeline Easement Does Not Satisfy the Horizontal-Privity Requirement. ........ 23

iv. The HPIP and Nordheim Agreements Do Not Convey a Profit á Prendre. ........ 24

3. The Nordheim Agreements Lack Any Element of "Vertical" Privity ..... 27

B. The Transportation Commitments Do Not Touch and Concern the Land ..... 28

1. The Transportation Commitments Do Not Impact the Value of the Land Independently of Collateral Circumstances. ..... 28

2. The Transportation Commitments Concern Personal Property, Not Real Property, and Thus Do Not Affect Sabine's Rights in the Land. ..... 30

C. The Objectors Cannot Demonstrate that the Parties Intended to Create Covenants Running with the Land. ..... 35

D. The Objectors' Policy Arguments Are Misguided. ..... 35

II. The Transportation Commitments Do Not Constitute Equitable Servitudes ..... 36

A. The Transportation Commitments Do Not Limit the Use of the Land. ..... 37

B. The Transportation Commitments Benefit HPIP and Nordheim, Not the Land. ..... 38

III. The Bankruptcy Court Correctly Allowed the Rejection of the Nordheim Agreements. ..... 39

CONCLUSION ..... 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altman v. Blake*,
712 S.W.2d 117 (Tex. 1986) ........ 21

*American Mfrs. Mut. Ins. Co. v. Schaefer*,
124 S.W.3d 154 (Tex. 2003) ........ 18

*American Ref. Co. v. Tidal W. Oil Corp.*,
264 S.W. 335 (Tex. Civ. App. 1924) ........ 24, 26, 27, 34

*Anderson v. Gipson*,
144 S.W.2d 948 (Tex. Civ. App. 1940) ........ 25

*Ball v. Rio Grande Canal Co.*,
256 S.W. 678 (Tex. Civ. App.—San Antonio 1923, writ ref'd) ........ 23, 24

*Billington v. Riffe*,
492 S.W.2d 343 (Tex. Ct. App. 1973) ........ 35

*Bland Lake Fishing & Hunting Club v. Fisher*,
311 S.W.2d 710 (Tex. Civ. App. 1958) ........ 25

*Chesapeake Expl., L.L.C. v. BNW Prop. Co.*,
393 S.W.3d 852 (Tex. 2012) ........ 21

*Clear Lake Apartments, Inc. v. Clear Lake Utilities Co.*,
537 S.W.2d 48 (Tex. App. 1976),
*aff'd as modified*, 549 S.W.2d 385 (Tex. 1977) ........ 9, 14, 15, 22, 23

*Clear Lake City Water Auth. v. Clear Lake Utils.*,
549 S.W.2d 385 (Tex. 1977) ........ 37, 38

*Colorado Interstate Gas Co. v. Hunt Energy Corp.*,
47 S.W.3d 1 (Tex. Ct. App. 2000) ........ 21, 31

*Concord Oil Co. v. Pennzoil Exploration & Prod. Co.*,
966 S.W.2d 451 (Tex. 1998) ........ 16

*Cross Timbers Oil Co. v. Exxon Corp.*,
22 S.W.3d 24 (Tex. App.—Amarillo 2000, no pet.) ........ 18

*Davis v. Skipper*,
83 S.W.2d 318 (Tex. 1935) ........ 8

*Ehler v. B.T. Suppenas Ltd.*,
74 S.W.3d 515 (Tex. Ct. App. 2002) ........................................................................ 13, 15

*El Paso Nat. Gas Co. v. Amoco Prod. Co.*,
1992 WL 43925 (Del. Ch. Mar. 4, 1992) .................................................................. 15, 22

*French v. Chevron USA, Inc.*,
871 S.W.2d 276 (Tex. Ct. App. 1994) ........................................................................... 21

*Goodwin v. Hidalgo Cty. Water Control & Improvement Dist. No. 1*,
58 S.W.2d 1092 (Tex. Civ. App. 1933),
*writ granted* (June 7, 1933),
*writ dismissed by agreement* (July 15, 1936) ................................................................ 13

*Graham v. Omar Gasoline Co.*,
253 S.W. 896 (Tex. Civ. App.—Fort Worth 1923, no writ) ....................................... 26, 27

*Harlan v. Vetter*,
732 S.W.2d 390 (Tex. App. 1987) ................................................................................ 16

*In re El Paso Refinery, LP*,
302 F.3d 343 (5th Cir. 2002) ........................................................................... 28, 29, 30, 32

*In re Energytec, Inc.*,
739 F.3d 215 (5th Cir. 2013) ........................................................................................ 15

*In re Jenkins*,
74 B.R. 440 (N.D. Ga. 1987) .......................................................................................... 8

*In re Schick*,
1998 WL 397849 (S.D.N.Y. July 16, 1998) .................................................................. 31

*Inwood N. Homeowners' Ass'n, Inc. v. Harris*,
736 S.W.2d 632 (Tex. 1987) ................................................................... 9, 10, 11, 12, 28

*Jim Walter Homes, Inc. v. Youngtown, Inc.*,
786 S.W.2d 10 (Tex. Ct. App. 1980) ...................................................................... 13, 15

*Lesley v. Veterans Land Bd. of State*,
352 S.W.3d 479 (Tex. 2011) ........................................................................................ 21

*Masgas v. Anderson*,
310 S.W.3d 567 (Tex. App. 2010) ...................................................................... 15, 16, 17

*Miller v. Speed*,
248 S.W.2d 250 (Tex. Civ. App. 1952) ......................................................................... 32

*Montfort v. Trek Resources, Inc.*,
198 S.W.3d 344 (Tex. App. 2006) ........ 34

*Moseley v. Arnold*,
2016 WL 690374 (Tex. App. Feb. 18, 2016) ........ 13

*MPH Prod. Co. v. Smith*,
2012 WL 1813467 (Tex. Ct. App. 2012) ........ 9

*Musgrave v. Brookhaven Lake Prop. Owners Ass'n*,
990 S.W.2d 386 (Tex. App. 1999) ........ 8

*Panhandle & S.F. Ry. Co. v. Wiggins*,
161 S.W.2d 501 (Tex. Ct. App. 1942) ........ 9, 15

*Phillips Petroleum Co. v. Adams*,
513 F.3d 355 (5th Cir. 1975) ........ 21, 37

*Pipe Line Co. v. Empire Natural Gas Co.*,
33 F.2d 248 (8th Cir. 1929) ........ 26

*Prochemco, Inc. v. Clajon Gas Co.*,
555 S.W.2d 189 (Tex. Civ. App. 1977) ........ 33

*Reagan Nat'l Advert. of Austin, Inc. v. Capital Outdoors, Inc.*,
96 S.W.3d 490 (Tex. App. 2002) ........ 8, 36, 37, 38

*Riley v. Riley*,
972 S.W.2d 149 (Tex. Ct. App. 1998) ........ 21, 37

*Rolling Lands Invs., L.C. v. Nw. Airport Mgmt., L.P.*,
111 S.W.3d 187 (Tex. App. 2003) ........ 13

*Russell v. City of Bryan*,
919 S.W.2d 698 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ........ 17

*Sabine Production Co. v. Frost Nat. Bank of San Antonio*,
596 S.W.2d 271 (Tex. Ct. App. 1980) ........ 21, 24, 31, 34

*Selected Lands Corp. v. Speich*,
702 S.W.2d 197 (Tex. App. 1985),
*writ refused NRE* (Apr. 2, 1986),
*supplemented* 709 S.W.2d 1 (Tex. App. 1985) ........ 13

*Stephens Cnty. v. Mid-Kansas Oil & Gas Co.*,
254 S.W. 290 (Tex. 1923) ........ 33

*Superior Phones, Ltd. v. Cherokee Commc'ns, Inc.*,
964 S.W.2d 325 (Tex. App. 1998) .......... 38

*Talley v. Howsley*,
170 S.W.2d 240 (Tex. Civ. App. 1943) .......... 10

*Tidal* and *Simms v. S. Pipe Line Co.*,
195 S.W. 283 (Tex. Civ. App. 1917) .......... 34

*Unit Petroleum Co. v. David Pond Well Serv., Inc.*,
439 S.W.3d 389 (Tex. Ct. App. 2014) .......... 8

*Wasson Interests, Ltd. v. Adams*,
405 S.W.3d 971 (Tex. Ct. App. 2013) .......... 9, 15, 27

*Wayne Harwell Properties v. Pan American Logistics Center, Inc.*,
945 S.W.2d 216 (Tex. Ct. App. 1997) .......... 9, 14, 28

*Westland Oil Dev. Corp. v. Gulf Oil Corp.*,
637 S.W.2d 903 (Tex. 1982) .......... 9, 10, 11, 12, 15, 28, 30

*Wimberly v. Lone Star Gas Co.*,
818 S.W.2d 868 (Tex. App. 1991),
*writ denied* (Feb. 26, 1992) .......... 12

**Statutes**

11 U.S.C. § 365(a) .......... 1, 3, 8, 39

28 U.S.C. § 1334 .......... 2

28 U.S.C. § 157 .......... 2

28 U.S.C. § 158(a)(1) .......... 2

Fed. R. Bankr. P. 8001(a) .......... 2

**Other Authorities**

16 Tex. Jur. 3d *Covenants, Conditions, & Restrictions* (2002) .......... 28

BLACK'S LAW DICTIONARY (10th ed. 2014) .......... 17

BLACK'S LAW DICTIONARY (6th ed. 1990) .......... 17

Merriam-Webster's Collegiate Dictionary (11th ed. 2003). .......... 17

Merrill, Thomas W. & Smith, Henry E.,
*Why Restate the Bundle?: The Disintegration of the Restatement of Property*,
79 BROOK. L. REV. 681 (2014) ........................................................................................ 13

Note,
*Touch and Concern, the Restatement (Third) of Property: Servitudes, and a Proposal*,
122 HARV. L. REV. 938 (2009) ........................................................................................ 14

Powell, Richard R.,
*Powell on Real Property* § 60.04[3][c][iii] (Michael Allan Wolf ed., 2005) ........................... 14

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES (2000) ........................................................ 14

Thomas, David A.,
*How Far Does the Covenant Run?*
*Covenants that Run with the Land in Oil and Gas Transactions*,
53 RMMLF-INST 19-1 ........................................................................................................ 14

TIFFANY REAL PROPERTY (3d ed. 2015) .................................................................... 9, 10, 14, 25

## INTRODUCTION

The Bankruptcy Code generally authorizes a bankruptcy trustee, with court approval, to assume or reject any executory contract or unexpired lease of the debtor. *See* 11 U.S.C. § 365(a). That authority makes sense: one of the main purposes of bankruptcy is to give the debtor a "fresh start" unencumbered by its past contractual commitments, which may have been imprudent or unsustainable (and indeed might have pushed the debtor into bankruptcy in the first place). Not surprisingly, the counterparties to such contracts often oppose such rejection—and the degree of their opposition is often proportional to the extent to which the relevant contracts benefit them, as opposed to the debtor.

A bankruptcy court's general authority to authorize the rejection of executory contracts, however, applies only to contractual rights, not to rights in real property. Thus, insofar as an executory contract creates a right in real property (as defined by relevant state law), a court may not reject that property right. Needless to say, that regime creates a strong incentive for a party seeking to avoid the ramifications of rejection to argue that an executory contract created a real property right that cannot be rejected, whether or not the rest of the contract can. And that is precisely what appellants HPIP Gonzales Holdings, LLC ("HPIP") and Nordheim Eagle Ford Gathering, LLC ("Nordheim") are trying to do here: they argue that the Bankruptcy Court had no power to authorize rejection of their executory contracts or the underlying performance obligations owed to them by the Debtor, Sabine Oil & Gas Corporation ("Sabine"), pursuant to those contracts because those contracts created real property rights.

As the Bankruptcy Court recognized, that argument is wrong. Under these so-called "midstream" agreements, HPIP and Nordheim transport and process Sabine's hydrocarbons after extraction from the ground and later return them to Sabine for resale—all for the payment of hefty fees (and deficiency payments if Sabine does not deliver a set minimum amount of

hydrocarbons). Under current market conditions, these agreements—if left intact—would imperil Sabine's ability to emerge from bankruptcy in a financially robust position (and thus also imperil the recovery of Sabine's secured creditors, who now own almost all of the equity in the reorganized company). But for the same reasons that Sabine wants to reject those agreements, HPIP and Nordheim want to keep them. The problem for HPIP and Nordheim is that, as a matter of black-letter Texas law, the covenants in those agreements do not run with the land; they are merely performance obligations under prepetition service agreements, and do not convey any interest in real property or create equitable servitudes.

HPIP and Nordheim essentially respond with a policy argument: the Bankruptcy Court's decision allowing Sabine to reject these contracts has had "broad disruptive ramifications for the Texas midstream industry." Consol. Br. 2. That argument is erroneous: the decision merely interprets these particular agreements, which do ***not*** convey a real property interest, and in no way precludes other contracting parties from entering into agreements that ***do*** convey a real property interest. In any event, the argument about "disruption" is misplaced: the Bankruptcy Code specifically allows the "disruption" of contractual expectations except insofar as those expectations involve an interest in real property. If HPIP and Nordheim think that regime is unfair and disruptive, they are free to present their grievances to Congress. This Court can and should resolve this dispute by affirming the Bankruptcy Court's Orders.

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had subject-matter jurisdiction over the underlying chapter 11 proceeding and the related adversary proceeding under 28 U.S.C. § 157 and 28 U.S.C. § 1334. This Court has jurisdiction over these appeals pursuant to 28 U.S.C. § 158(a)(1) and Federal Rule of Bankruptcy Procedure 8001(a).

## STATEMENT OF THE ISSUES

1. Whether the Bankruptcy Court correctly held that the Transportation Commitments[2] in Sabine's agreements with Nordheim and HPIP do not constitute covenants that run with the land under Texas law.

2. Whether the Bankruptcy Court correctly held that the gas and condensate Transportation Commitments in Sabine's agreements with Nordheim and HPIP do not create equitable servitudes under Texas law.

3. As to Nordheim only, whether the Bankruptcy Court erred by allowing Sabine to reject the gathering agreements pursuant to the business judgment rule under 11 U.S.C. § 365(a).

## STATEMENT OF THE CASE

Sabine, together with its Debtor and non-Debtor affiliates, is an independent energy company engaged in the exploration, production, and development of onshore oil and natural gas properties in the United States. Nord. Dkt. 12 at ¶ 1; HPIP Dkt. 14 at ¶ 1. On July 15, 2015, each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Main Dkt. 1.

On September 30, 2015, the Debtors filed a Motion to reject their gathering agreements with Nordheim and HPIP (together, the "Agreements"). Main Dkt. 371. HPIP and Nordheim (together, the "Objectors") objected to the Motion, asserting that certain acreage dedications in the Agreements could not be eliminated via rejection because they are covenants that run with the land under Texas law. Main Dkt. 386 & 387. The Bankruptcy Court rejected that argument and, on March 8, 2016, issued a bench decision authorizing Sabine to reject the Agreements as a valid exercise of the business judgment rule. Main Dkt. 872. Because the Bankruptcy Court's decision regarding whether the Transportation Commitments run with the land was non-binding, the parties sought a binding decision by asserting claims for declaratory relief in adversary

[2] The commitments for the gathering, transportation, and processing of Sabine's hydrocarbons by Nordheim and HPIP, *see infra* at pp. 4-6, are collectively referred to in this brief as the "Transportation Commitments."

proceedings. Nord. Dkt. 1 & 5; HPIP Dkt. 1 & 8. The Objectors filed motions for judgment on the pleadings, and Sabine filed a cross-motion for summary judgment. Nord. Dkt. 7-8, 10-11; HPIP Dkt. 9-10; 12-13. On May 11, 2016, the Bankruptcy Court granted a Final Order authorizing the Debtors' rejection of the Agreements. Main Dkt. 1082. On that same date, the Bankruptcy Court issued Final Orders in the adversary proceedings, granting the Debtors' motion for summary judgment and denying the Objectors' cross-motions for judgment on the pleadings. Main Dkt. 1083 & 1084. The Objectors appealed these decisions. Main Dkt. 1098 & 1142; Nord. Dt. 24; HPIP Dkt. 24.

### A. The HPIP Agreements

Sabine is party to two executory services contracts with HPIP: (1) the Production Gathering, Treating and Processing Agreement dated May 3, 2013 (the "HPIP Gathering Agreement," HPIP Dkt. 14 Ex. 9); and (2) the Water and Acid Gas Handling Agreement dated May 2014 (the "HPIP Handling Agreement," together with the HPIP Gathering Agreement, the "HPIP Agreements").[3]

The HPIP Gathering Agreement provides for HPIP to construct and operate gathering facilities and perform gathering services for the oil and gas that Sabine extracts from its mineral estate in a certain geographic area (the "HPIP Dedicated Area") and delivers to HPIP. HPIP Dkt. 14 at ¶ 12. The HPIP Gathering Agreement contains the following material terms:

- HPIP agrees to process all of the gas produced and delivered to it by Sabine from Sabine's wells within a certain geographic area and to redeliver such gas to Sabine's metered points of redelivery, where Sabine resumes control of the gas either directly or by having the gas transferred the designated pipeline of a third party. *See* HPIP Gathering Agreement § 3.1.4.

[3] The HPIP Handling Agreement provides for HPIP to construct, operate, and maintain disposal facilities for and perform disposal services with respect to all of the water and acid gas produced by Sabine within the HPIP Dedicated Area.

- Sabine dedicates and agrees to deliver all of the gas that it produces from the wells in the HPIP Dedicated Area to HPIP for processing. *See id.* § 1.2.

- Sabine agrees to pay several fees for HPIP's processing services, which are largely based on the volume of gas delivered to HPIP for production. *See id.* § 5.

- Sabine expressly retains all title and interest in its property. *See id.* § 9.3 ("[Sabine] expressly does not by the terms of this Agreement, sell, transfer or assign unto [HPIP] any title or interest whatsoever in [its oil and gas leases]."); Appx. § 4 ("Title to all [of Sabine's produced oil and gas] shall at all times remain with [Sabine]."); Appx. § 7 ("[Sabine] is not obligated to assign and transfer to [HPIP] the right[s] under its leasehold interest [including] rights of ingress and egress.").

- Sabine reserves the right to "operate the Leases free of any control by Gatherer." HPIP Gathering Agreement, Appx. § 3.B.

**B. The Nordheim Agreements**

In 2013, Sabine South Texas LLC (a Sabine subsidiary) acquired oil and gas leases in the Eagle Ford region in DeWitt County, Texas. Nord. Dkt. 12 ¶ 2. To begin developing those leases, Sabine entered into two executory service contracts with Nordheim, each dated January 23, 2014. Nord. Dkt. 12 ¶¶ 3-4. The first contract is a Gas Gathering Agreement (the "Nordheim Gas Gathering Agreement," Nord. Dkt. 12 at Ex. 3), and the second is a Condensate Gathering Agreement (the "Nordheim Condensate Gathering Agreement," Nord. Dkt. 12 at Ex. 4, together with the Nordheim Gas Gathering Agreement, the "Nordheim Agreements"). Both contain substantially similar terms, with one applicable to gas and the other to condensate, and provide for Nordheim to transport all of the gas or condensate produced by Sabine in a certain geographic area (the "Nordheim Dedicated Area"). Nord. Dkt. 12 ¶¶ 3–4.

The Nordheim Agreements contain the following material terms:

- Nordheim agrees to "receive," "treat," "dehydrate," and redeliver to Sabine or a designated third party all of the "Dedicated Gas delivered" to it by Sabine, and to similarly receive and redeliver all condensate delivered to it by Sabine that satisfies certain purity requirements. *See* Nordheim Agreements § 2.3.

- Sabine dedicates and agrees to deliver "all Gas/Condensate produced" from the wells in the Nordheim Dedicated Area to Nordheim for processing. *See id*. § 1.1.

- Sabine agrees to pay certain gathering fees for Nordheim's processing services. *See id*. § 5.1.

- Sabine agrees, for each year of the contract, to deliver certain minimum volumes of gas and condensate (the "Minimum Volume Commitment") or pay an additional fee (each such fee a "Deficiency Payment"). *See id*. § 1.9.

- Sabine expressly retains all title to its property. *See* Nordheim Agreements, Appx. § 3.7.

- Sabine reserves the right "to operate its Interests free from any control by Gatherer and in a manner as Shipper, in its sole discretion, may deem advisable." Nordheim Agreements § 1.4.

Pursuant to the Nordheim Agreements, Nordheim agreed to construct a gathering system of pipelines and treatment facilities to provide certain agreed-upon midstream services. Nord. Dkt. 12 ¶ 6. The Nordheim Gas Gathering Agreement contemplated a separate and subsequent conveyance from Sabine to Nordheim of a mutually-agreed tract of land in connection with Nordheim's construction of the gathering system. Nord. Dkt. 12 ¶ 11. Sabine had acquired a 38-acre surface tract in October 2013. Nord. Dkt. 12 ¶ 7. On March 11, 2014, Sabine conveyed to Nordheim pursuant to a warranty deed approximately 17 acres of that tract (the "Nordheim Surface Parcel") so that Nordheim could construct a gathering facility. Nord. Dkt. 12 ¶¶ 7-8. Also on March 11, 2014, Sabine conveyed to Nordheim a Pipeline and Electrical Easement (the "Pipeline Easement"), which granted Nordheim a 90-foot pipeline and electrical easement over the remaining 21 acres. Nord. Dkt. 12 ¶ 10. This Pipeline Easement allowed Nordheim to install and operate two pipelines and one electrical utility line for gathering and transporting Sabine's gas and condensate. *Id.*

## ARGUMENT

The Bankruptcy Court correctly permitted Sabine to reject its service agreements with the Objectors as a valid exercise of its business judgment. The rejection of those contracts was a key part of the Debtors' Chapter 11 reorganization, which has now been substantially consummated: it essentially frees Sabine, post bankruptcy, from a $35 million prepetition financial obligation that would have otherwise burdened the reorganized Sabine and impaired the value of the consideration provided to Sabine's prepetition creditors (who own almost all of the equity in the reorganized Sabine) as part of the settlement embodied in the consummated Chapter 11 plan. The Objectors, who were unsecured creditors, are essentially seeking to jump the line ahead of secured creditors and keep this $35 million in value for themselves. But they cannot do so unless the relevant contracts gave them a real property right. Because the undisputed record demonstrates that those contracts did not, their objections to the Bankruptcy Court's Orders are meritless.

To establish that a covenant runs with the land under Texas law, a party must establish five independent elements, at least three of which are not met here: ***First***, there exists no privity of estate between Sabine and the Objectors. The Agreements are service agreements wherein the Objectors contracted to gather and transport Sabine's gas and condensate for a fee; it is not, and is not analogous to, a conveyance of real property. ***Second***, the Transportation Commitments do not touch and concern the land because (1) they do not impact the value of the land, and (2) they concern personal—and not real—property. ***Third***, the Objectors cannot show that the parties to the Agreements intended to create covenants that run with the land. The Agreements do not use words of conveyance; instead, they explicitly state that Sabine retained the title and ownership rights to its gas and condensate and disclaim assigning any interest whatsoever in the Leases.

The Bankruptcy Court also correctly held that the Agreements do not create equitable servitudes as a matter of law because they do not burden the use of Sabine's land, nor do they benefit the Objectors' land; they simply benefit the Objectors personally.

Because the Agreements do not convey any interest in real property, the Bankruptcy Court properly allowed Sabine to reject the Agreements pursuant to the business judgment rule under 11 U.S.C. § 365(a).

## I. THE AGREEMENTS DO NOT CONTAIN COVENANTS RUNNING WITH THE LAND.

The Transportation Commitments in the Agreements are not covenants that run with the land as a matter of Texas law. "In every case where parties seek to enforce a restrictive covenant, the burden of proof is upon them to establish that the covenant was imposed." *Davis v. Skipper*, 83 S.W.2d 318, 321-22 (Tex. 1935); *see also Reagan Nat'l Adver. of Austin, Inc. v. Capital Outdoors, Inc*., 96 S.W.3d 490, 495 (Tex. App. 2002) (quoting *Davis*). The Objectors cannot meet this burden simply by pointing to contractual language stating that the covenants run with the land. Under settled Texas law, a covenant running with the land is ***not*** created simply by being named as such in a contract. *See, e.g.*, *Musgrave v. Brookhaven Lake Prop. Owners Ass'n*, 990 S.W.2d 386, 395 (Tex. App. 1999) ("[T]erminology ... is not dispositive [as to] an obligation intended to run with the land ...."); *see also Unit Petroleum Co. v. David Pond Well Serv., Inc.*, 439 S.W.3d 389, 396 (Tex. Ct. App. 2014) (under Texas law, an "oil and gas lease" is not a lease despite its name); *In re Jenkins*, 74 B.R. 440, 445 (N.D. Ga. 1987) ("[L]anguage in an instrument of conveyance or contract cannot create a covenant running with the land merely by stating that the interest conveyed is such ....").

Rather, in order for the Transportation Commitments to run with the land under Texas law, the Objectors must satisfy five elements, the absence of any one of which is fatal to their

position: (1) there must be privity of estate; (2) the Transportation Commitments must "touch and concern" the land; (3) the Transportation Commitments must relate to a thing in existence or specifically bind the parties and their assigns; (4) the Transportation Commitments must be intended by the original parties to run with the land; and (5) the successor to the burden must have notice. *See Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987).

The record in this case shows that the Objectors cannot meet their burden to establish at least three of these required elements: (1) privity of estate; (2) that the Transportation Commitments "touch and concern" the land; and (3) that the parties intended the Transportation Commitments to be covenants that run with the land.

**A. There Is No Privity of Estate Between Sabine and the Objectors Because the Agreements Do Not Convey an Interest in Property.**

For a covenant to run with the land under Texas law, privity of estate—*both* horizontal *and* vertical—must exist between the parties. *See, e.g.*, *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910-11 (Tex. 1982); *Wayne Harwell Properties v. Pan American Logistics Center, Inc.*, 945 S.W.2d 216, 218 (Tex. Ct. App. 1997); *Panhandle & S.F. Ry. Co. v. Wiggins*, 161 S.W.2d 501, 505 (Tex. Ct. App. 1942); *Clear Lake Apartments, Inc. v. Clear Lake Utilities Co.*, 537 S.W.2d 48, 51 (Tex. App. 1976), *aff'd as modified*, 549 S.W.2d 385 (Tex. 1977); *MPH Prod. Co. v. Smith*, 2012 WL 1813467, *2 (Tex. Ct. App. 2012). "Privity of estate between covenanting parties means a mutual or successive relationship exists to the same rights in property." *Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. Ct. App. 2013). Horizontal privity refers to "privity of estate between the covenantor and the covenatee at the time the covenant was created." 3 TIFFANY REAL PROPERTY § 851 (3d ed. 2015). For horizontal privity to exist, one party must have granted, sold, or otherwise conveyed to the other party an

interest in the property to which the covenant is said to attach when creating the covenant. Vertical privity refers to "privity of estate between the covenanting parties and their successors in interest." *Id.*

A transfer of a real property interest is fundamental to either concept of privity: a party seeking to enforce a covenant as running with the land must have been conveyed, and presently own, the same interest in property to which the covenant is said to attach. *See Talley v. Howsley*, 170 S.W.2d 240, 243 (Tex. Civ. App. 1943) (noting that a covenant running with the land "only runs with the land conveyed to or by the covenantor"). Nordheim and HPIP cannot establish horizontal or vertical privity of estate with Sabine for the simple and fundamental reason that the Agreements do not convey a real property interest.

### ***1. Horizontal Privity Is Required for a Covenant to Run with the Land under Texas Law.***

To avoid the conclusion that horizontal privity does not exist between Sabine and either Nordheim or HPIP, the Objectors argue that Texas law no longer requires horizontal privity. In doing so, the Objectors do not deny that the Texas Supreme Court has previously stated that horizontal privity is a requirement for a covenant to run with the land. *See* Consol. Br. 16-19. Nor do they deny that Texas appellate courts have recently held that horizontal privity remains a requirement. *Id*. Indeed, the Objectors identify ***no*** Texas case—Supreme Court or otherwise—holding that horizontal privity is no longer required for a covenant to run with the land.

The Objectors instead attempt to interpret the Texas Supreme Court's ***silence*** on horizontal privity in two thirty-year-old decisions in which there was horizontal privity—*Westland* and *Inwood*—to have implicitly overruled previous holdings requiring horizontal privity. They also cite commentators who note that some states (but not Texas) have abandoned horizontal privity, and the Third Restatement of Property's proposed rejection of the horizontal

privity requirement based on the authors' public-policy views. With only this scant support, the Objectors invite this Court to go where no Texas court has ever gone—to hold that a covenant running with the land can be created in the absence of horizontal privity. *See* Consol. Br. 16-19. This Court should decline the invitation; its duty as a federal court is to ***apply***, not ***invent***, state law.

While it is certainly true that the Texas Supreme Court did not explicitly address the horizontal privity requirement in *Westland* and *Inwood*, that proves nothing, as that requirement was plainly satisfied in both cases, and thus not at issue in either. In *Westland*, Westland Oil sought declaratory judgment that a November 1966 letter agreement involving a farmout[4] applied to mineral interests related to that farmout. *See* 637 S.W.2d at 905-06. The court held that there was sufficient privity of estate for the covenants contained in the November 1966 letter agreement to run with the oil and gas leases at issue. *Id.* at 910-11. In doing so, the court implicitly recognized that the horizontal privity requirement was satisfied. The court specifically noted that this letter agreement "is in the nature of a contract to convey interests in oil and gas leases." *Id.* at 905; *see also id*. at 910 ("The agreement contained within paragraph 5 of the November 15, 1966 letter agreement ***is a contract to convey interests in oil and gas leases***. Such an agreement ... involved covenants running with the land."). As that language underscores, the November 1966 letter agreement conveyed an interest in real property related to the covenants at the time those covenants were created.[5]

---

[4] A farmout is an assignment of a percentage of ownership in oil and gas leases that is conveyed in exchange for the provisions of services, such as the drilling of a well, instead of money or debt.

[5] Moreover, the so-called vertical-privity analysis in *Westland* that Objectors emphasize appears to address another instance of horizontal privity related to a separate leasehold assignment from May 1973. That assignment was explicitly subject to a March 1968 operating

Horizontal privity also existed in *Inwood*. There, the court enforced a homeowners' association's lien for past due assessment payments on subsequent homeowners based on a finding that covenants requiring such payments ran with the land. 736 S.W.2d at 633-37. While the court did not explicitly address the horizontal privity requirement, it is clear that such privity existed. The covenants requiring payment were expressly incorporated into the deeds, meaning that the land subject to the covenants was conveyed in the same agreement in which those covenants were created. *See id.* at 633-34.

The Objectors' reliance on cases from the Texas intermediate appellate courts fares no better. The Objectors cite no cases supporting their view that Texas has abolished the horizontal privity requirement. Instead, the best they can do is to cite a handful of cases that "similarly analyzed whether covenants run with the land without considering horizontal privity." Consol. Br. 18. The facts of those cases, however, likewise establish horizontal privity. For example, in *Wimberly v. Lone Star Gas Co.*, 818 S.W.2d 868 (Tex. App. 1991), *writ denied* (Feb. 26, 1992), the Texas Court of Appeals did not address privity ***at all***, as neither horizontal nor vertical privity was challenged by the landowner seeking to avoid the covenant. *See id.* at 871. It is unsurprising that the landowner in *Wimberly* did not assert a lack of horizontal privity, as that case involved a sale of water rights between the covenanting parties at the time the covenant was created, which sale constituted a conveyance of a real property interest under Texas law. *See Goodwin v. Hidalgo Cty. Water Control & Improvement Dist. No. 1*, 58 S.W.2d 1092, 1094

---

agreement, which incorporated the November 1966 letter agreement—and the covenant at issue—by reference. 637 S.W.2d at 907. The covenants from the November 1966 letter agreement were contained in the assignment of the contested leasehold interests to the party with whom the covenants were sought to be enforced. This independently satisfies the horizontal privity requirement.

(Tex. Civ. App. 1933), *writ granted* (June 7, 1933), *writ dismissed by agreement* (July 15, 1936) ("[W]ater rights are real property.").

Indeed, contrary to the Objectors' position, Texas courts have routinely analyzed horizontal privity post-*Inwood*. *See*, *e.g.*, *Moseley v. Arnold*, 2016 WL 690374, at *3 n.6 (Tex. App. Feb. 18, 2016) ("Further, there must also be ***privity of estate between the parties when the covenant was established***.") (internal quotations omitted) (emphasis added); *Rolling Lands Invs., L.C. v. Nw. Airport Mgmt., L.P.*, 111 S.W.3d 187, 200 (Tex. App. 2003), *as clarified* July 3, 2003 ("There must also be privity of estate ***between the parties when the covenant was made***.") (emphasis added).[6] Far from outliers, these cases are consistent with a litany of other Texas cases and the express mandate of the Texas Supreme Court, recognizing that horizontal privity is required for a covenant to run with the land.

Given the lack of Texas law to support their position, the Objectors are left to cite commentators and the Third Restatement of Property. *See* Consol. Br. 18-19. But these sources do not purport to describe Texas law, and cannot substitute for Texas authorities. The Restatement that the Objectors cite is known for being devoted more to law reform than to a faithful restatement of the law and has been largely ignored by courts.[7] These secondary sources are irrelevant to whether horizontal privity is required under Texas law.[8]

---

[6] *See also Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 521 (Tex. App. 2002) (same); *Jim Walter Homes, Inc. v. Youngtown, Inc.*, 786 S.W.2d 10, 11 (Tex. App. 1990) ("Restrictive covenants which run with the land are ***created only by parties in privity of estate and bind subsequent vendees***.") (emphasis added); *Selected Lands Corp. v. Speich*, 702 S.W.2d 197, 199 (Tex. App. 1985), *writ refused NRE* (Apr. 2, 1986), *supplemented* 709 S.W.2d 1 (Tex. App. 1985) ("The creation of a covenant running with the land at law requires that: (1) ***privity of estate exist between the covenanting parties.***") (emphasis added).

[7] *See, e.g.,* Thomas W. Merrill & Henry E. Smith, *Why Restate the Bundle?: The Disintegration of the Restatement of Property*, 79 BROOK. L. REV. 681, 681-82, 692-95 (2014) ("The ratio of reform to restatement has increased over time, to the point where significant

Nordheim and HPIP have identified no authority suggesting that Texas courts have suddenly and silently abandoned the longstanding requirement that privity of estate must exist between the parties at the time the covenant was made for that covenant to run with the land. The Objectors' attempt to avoid that requirement is unfounded.

***2. Nordheim and HPIP Cannot Meet Their Burden to Establish Horizontal Privity.***

It is no accident that Nordheim and HPIP devote so much energy to trying to avoid the horizontal privity requirement, because they cannot remotely satisfy it. For horizontal privity to exist such that a covenant runs with the land under Texas law, "the covenant," as noted, "must be made between parties who are in privity of estate at the time the covenant was made, and must be contained in a grant of land or in a grant of some property interest in land." *Wasson*, 405

---

portions of the *Third Restatement* consist of repudiating what was done in the *First* and *Second Restatements* ...."); *id.* at 681 n.1 ("[T]he THIRD RESTATEMENT repudiates the FIRST RESTATEMENT's version of servitudes ...."); *id.* at 693-94 ("To date, the courts have largely ignored the reforms urged by the *Restatements (Third) of Servitudes* and have instead continued to apply the 'outmoded' common law in determining when servitudes run with the land."); Note, *Touch and Concern, the Restatement (Third) of Property: Servitudes, and a Proposal*, 122 HARV. L. REV. 938, 938 (2009) ("As of this writing, only one line of cases has used the ALI's new test.").

[8] Indeed, the Third Restatement cites two Texas cases as "[m]odern cases supporting continued existence of the [horizontal privity] requirement." *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.4 (2000) (citing *Wayne Harwell Properties v. Pan American Logistics Center, Inc.*, 945 S.W.2d 216 (Tex. Ct. App. 1997) and *Clear Lake*, 537 S.W.2d 48). In addition, David A. Thomas, whom the Objectors cite, states that scholars conclude that American courts are tending away from requiring horizontal privity, but notes that the preeminent treatise, *Powell on Real Property*, "declares that 'many states appear to require horizontal privity,' and gives dozens of case citations representing 18 states," including Texas. David A. Thomas, *How Far Does the Covenant Run? Covenants that Run with the Land in Oil and Gas Transactions*, 53 RMMLF-INST 19-1 § 19.04(5)(b)(i) & n.52 (citing 9 Richard R. Powell, *Powell on Real Property* § 60.04[3][c][iii] (Michael Allan Wolf ed., 2005); *See also* 3 Tiffany Real Prop. § 851 (3d ed.) ("Most states require a showing of both horizontal and vertical privity by a party seeking enforcement at law of a covenant running with the land."). No secondary source cited by Nordheim and HPIP, or any secondary source reviewed to date, asserts that Texas has abandoned the horizontal privity requirement.

S.W.3d at 973; *see also Jim Walter Homes, Inc. v. Youngtown, Inc.*, 786 S.W.2d 10, 11 (Tex. Ct. App. 1980) (finding no privity of estate where allegedly burdened party was not owner of land and explaining that "restrictive covenants which run with the land are created only by parties in privity of estate…."); *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (quoting *Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 521 (Tex. Ct. App. 2002)) ("[T]here must be privity of estate between the parties when the covenant was made…."); *Westland*, 637 S.W.2d at 910 (same). Further, a "covenant may only validly be created as part of the conveyance of an interest ***in the land burdened with the covenant***." *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, 1992 WL 43925, at *11 (Del. Ch. Mar. 4, 1992) (emphasis added) (citing *Clear Lake*, 537 S.W.2d at 51; *Panhandle & S.F. Ry. Co. v. Wiggins*, 161 S.W.2d 501, 505 (Tex. App. 1942)).

Sabine conveyed to the Objectors ***no*** interest in the real property allegedly burdened by the Transportation Commitments—*i.e.*, the mineral interests from which Sabine produces oil and gas. Accordingly, no horizontal privity exists between the parties, and no covenant running with the land was created.

***a. The Agreements Do Not Grant Any Interest in Property, Real or Personal.***

A conveyance of a mineral estate or interest therein, not surprisingly, requires the grant of such interest. *See, e.g.*, *Masgas v. Anderson*, 310 S.W.3d 567, 571 (Tex. App. 2010) (no conveyance of interests in oil and gas leases where the relevant agreement "does not contain operative words or words of grant"). Under Texas law, a valid grant or conveyance requires clear language (1) identifying a grantor and grantee; (2) evidencing an actual grant of such interest; and (3) demonstrating the intent of the grantor to convey an interest in property. *See id.*

When "construing mineral and other grants," "[t]he primary objective" of Texas courts "is to determine the intent of the parties from all the language in the instrument." *Concord Oil*

*Co. v. Pennzoil Exploration & Prod. Co.*, 966 S.W.2d 451, 454 (Tex. 1998). "If there are operative words or words of grant showing an intention of the grantor to convey title to a real property interest to the grantee [it is] legally effective as a conveyance." *Harlan v. Vetter*, 732 S.W.2d 390, 392 (Tex. App. 1987). Where oil and gas contracts expressly disclaim the intent to transfer title or interest in oil and gas properties, however, Texas courts have held there to be no conveyance. *See Masgas*, 310 S.W.3d at 571 (holding a joint operating agreement not to include a conveyance of a mineral lease interest where the agreement stated "this shall not be deemed an assignment or cross-assignment of interests covered hereby").

The Agreements at issue here do not grant or convey any interest in real property from Sabine to HPIP or Nordheim. No words of conveyance or others words showing an intent to grant property are found in the Agreements, and no grantee of a conveyance is identified. To the contrary, the parties explicitly disclaimed any assignment or conveyance of an interest in the property dedicated and committed to the performance of the Agreement.

*The HPIP Agreements.* The dedication provision of the HPIP Gathering Agreement that HPIP claims gives rise to a covenant running with the land states:

> [Sabine] hereby dedicates and commits to the performance of this Agreement the Leases and all of [Sabine's] owned or controlled Production produced and saved from [Sabine's] operated Wells located on the Leases, and to ensure the faithful performance of the provisions of this Agreement, [Sabine] covenants to deliver the same to Gatherer…. This shall be a covenant attaching to and running with the lands….

HPIP Gathering Agreement § 1.2.[9] Consol. Br. 7. This language does not amount to a conveyance of real property because there is no language of conveyance, such as a "grant" of an

[9] The HPIP Handling Agreement similarly states that "[Sabine] hereby dedicates and commits to the performance of this Agreement all the Fluids produced by the actions and activities contemplated by the Gathering Agreement…Should [HPIP] suspend or modify operation of the Central Facilities, [Sabine] may, at its option, terminate the commitment

"interest in" any leasehold, fee, or other property interest. *See Masgas*, 310 S.W.3d at 571 (holding that a conveyance was not effective where there were no "granting words."). Rather, the provision states only that Sabine "dedicates and commits" its leases and production "to the performance of this Agreement." *Id*. A plain reading of the words "dedicate" ("to set apart to a definite use")[10] and "commit" ("to pledge ... to some particular course or use")[11] makes clear that Sabine has not granted or conveyed any property by this language.

Further, the HPIP Agreements do not identify a grantee. Sabine does not dedicate or commit its production to HPIP, but to the Agreement itself. As the Bankruptcy Court recognized, this language amounts to nothing more than a contractual promise that Sabine will deliver the oil and gas produced from the HPIP Dedicated Area to HPIP for purposes of the agreement, making HPIP the exclusive gatherer for such oil and gas production, and not the recipient of a property grant.[12]

Most importantly, Sabine actually expressly ***disclaims*** any intent to convey property to HPIP in the HPIP Agreements: "[Sabine] expressly does not, by the terms of this Agreement,

---

provided for hereinabove. This shall be a covenant attaching to and running with the lands and leasehold interests covered hereby…." *See* HPIP Handling Agreement § 1.2.

[10] "Dedicate." Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003). The definition of "dedication" from Black Law's Dictionary cited by HPIP is inapplicable. (HPIP Br. at 13.) This form of "dedicate" does not denote any conveyance of land or an easement but is limited—by definition—to donations of land for public use. *See* BLACK'S LAW DICTIONARY (10th ed. 2014); *Russell v. City of Bryan*, 919 S.W.2d 698, 702 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("'Dedication' is defined as '***[t]he appropriation of land, or an easement therein***, by the owner, for the use of the public, and accepted for such use by or on behalf of the public.' Thus, the key is public use ....") (citing BLACK'S LAW DICTIONARY (6th ed. 1990). Sabine and the Objectors did not intend this definition of the word "dedicates" in the Agreements, which cannot be construed as donating Sabine's gas and condensate for public use.

[11] "Commit." Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003).

[12] This language also does not identify any grantee to whom Sabine's leases and production have been granted.

sell, transfer, or assign unto [HPIP] any title or interest whatsoever in the Leases." HPIP Gathering Agreement § 9.3; HPIP Handling Agreement § 8.3. "Title to all [of Sabine's produced oil and gas] shall at all times remain with [Sabine]." *Id.*, Appx. § 4. "[Sabine] is not obligated to assign and transfer to [HPIP] the right[s] under its leasehold interest [including] rights of ingress and egress." HPIP Gathering Agreement, Appx. § 7. Such disclaimers plainly demonstrate that the parties' intent in executing the HPIP Agreements was to avoid, not create, a conveyance of an interest in Sabine's oil and gas properties.

HPIP attempts to avoid this express language by arguing that the language "does not disclaim the transfer of interest in the Leases or Production elsewhere in the HPIP Gathering Agreement" but instead "merely states that no broader conveyance of title to or interests in the Leases and Production was to be inferred from the HPIP Gathering Agreement." HPIP Br. 15. HPIP's argument ignores the Agreement's actual language: "[Sabine] expressly does not ... sell, transfer, or assign unto [HPIP] ***any*** title or interest ***whatsoever*** in the Leases ...." HPIP Gathering Agreement § 9.3 (emphasis added). HPIP may not now rewrite the HPIP Agreements to narrow this broad disclaimer. *See American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("[W]e may neither rewrite the parties' contract nor add to its language."); *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.) ("[W]e may not rewrite the agreement to mean something it did not. Simply put, we cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it.").

*The Nordheim Agreements.* Similarly, the dedications contained in the Nordheim Agreements state that Sabine:

> Dedicates for gathering under this Agreement, and shall deliver or cause to be delivered ... all [gas/condensate] produced and saved on or after the Effective

> Date from wells now or hereafter located within the Dedicated Area or on lands pooled or unitized therewith, to the extent such [gas/condensate] is attributable to the Interests within the Dedicated Area now owned, leased or hereafter acquired by [Sabine and its] successors or assigns.

*See* Nordheim Agreements § 1.2. As with the HPIP Agreements, these dedications constitute contractual promises that Sabine shall deliver oil and gas production to Nordheim as the exclusive gatherer; they do not identify a grantee or contain the appropriate "grant" language that would effectuate a conveyance in the mineral estate to Nordheim. The absence of such language is unsurprising, as Sabine does not own the mineral estate referred to in the Nordheim Agreements and thus could not convey an interest in something which it does not own—Sabine South Texas owns the mineral estate, and Sabine South Texas is not a party to the Nordheim Agreements.

Sabine also expressly disclaims any intent to convey the dedicated property to Nordheim in the Nordheim Agreements, stating that title to all oil and gas within the Nordheim Dedicated Area "shall remain with and in [Sabine] or its customers at all times." *See* Nordheim Agreements, Appx. § 3.7. Nordheim does not own Sabine's gas and condensate but transports and processes it. Nordheim is obligated under the Agreements to return any gathered and processed gas back to Sabine. *See* Nordheim Agreements § 2.3.

Had Sabine and Nordheim wished to create a conveyance or sale transaction, they would have used the clear, unambiguous language they used for the sale of a separate parcel of land to Nordheim for purposes of constructing its gathering facilities. Each of the Nordheim Agreements contains a provision contemplating the sale of certain unrelated surface land (which Sabine, rather than Sabine South Texas, actually owned) to Nordheim for purposes of

constructing the Nordheim Gathering Facilities. *See* Nordheim Agreements § 2.4.[13] The fact that the Nordheim Agreements provided for an unambiguous conveyance in an unrelated context evinces that, had the parties wanted to include a clear grant in the acreage dedication, they could have and would have.

***b. The Real Property Interests Identified by Objectors Do Not Satisfy Horizontal Privity.***

The Objectors assert that horizontal privity is satisfied by the conveyance of certain real property interests in the Agreements. *See* Consol. Br. 19-23; HPIP Br. 12-16. HPIP claims that horizontal privity exists because the Agreements convey an interest in Sabine's mineral estate. HPIP Br. 12-16. Nordheim claims that horizontal privity exists due to the conveyance of the Nordheim Surface Parcel and the Pipeline Easement. *See* Consol. Br. 19-21. Both HPIP and Nordheim argue that the Agreements convey to the Objectors a profit á prendre to Sabine's gas and condensate and that the grant of this profit satisfies horizontal privity. *See id.* at 21-23; HPIP Br. 15 n.12. None of the real property interests identified, however, satisfies horizontal privity because the Agreements either do not convey such an interest (the alleged interest in the mineral estate and profit á prendre) or the conveyed real property is not burdened by the Transportation Commitment (the Nordheim Surface Parcel and the Pipeline Easement).

***i. The Agreements Do Not Convey Any Interest in the Mineral Estates.***

HPIP maintains that the HPIP Gathering Agreement conveyed an interest in Sabine's mineral estate such that it "creat[ed] a mutual interest in real property." HPIP Br. 12. The Agreements, however, do not grant any right to the mineral estate recognized under Texas law.

[13] Subsequently, Sabine and Nordheim executed a surface deed, specifying that Sabine "has GRANTED, BARGAINED, SOLD, and CONVEYED" the tract of land to Nordheim. (Nord. Dkt. 12 at Ex. 6.)

Therefore, the Agreements do not convey a real property interest in the mineral estate, and the parties lack horizontal privity.

Texas courts determining whether a mineral estate or any right therein has been conveyed consistently require evidence of the grant of at least one right in the mineral estate. *See French v. Chevron USA, Inc.*, 871 S.W.2d 276 (Tex. Ct. App. 1994). Under Texas law, there are "five real property rights that comprise a mineral estate." *Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 480–81 (Tex. 2011). These five rights are: "(1) the right to develop (the right of ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, (5) the right to receive royalty payments." *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986). Each of these five rights "is a separate and distinct property interest which may be conveyed or reserved separately and/or conveyed or reserved relative to any of the other interests." *Chesapeake Expl., L.L.C. v. BNW Prop. Co.*, 393 S.W.3d 852, 855 (Tex. 2012). These five rights represent the sum total of a mineral estate and cannot be expanded.

Once minerals are produced—or taken from the ground—they cease to be real property and instead become personalty. *See, e.g.*, *Sabine Production Co. v. Frost Nat. Bank of San Antonio*, 596 S.W.2d 271, 276 (Tex. Ct. App. 1980) ("Once minerals have been severed from the reservoir or strata wherein they were originally contained, such minerals ... become personalty."); *Colorado Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 10 (Tex. Ct. App. 2000) ("Once oil or gas has been severed from the ground, it becomes personalty."); *Riley v. Riley*, 972 S.W.2d 149, 155 (Tex. Ct. App. 1998) (citing *Phillips Petroleum Co. v. Adams*, 513 F.3d 355, 363 (5th Cir. 1975) ("Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production.")).

Neither the Nordheim nor the HPIP Agreements convey any of the five property rights that comprise a mineral estate under Texas law.[14] Nordheim and HPIP do not have—nor do they claim—the right to drill or otherwise develop gas from Sabine's mineral estates; the right to lease or assign the mineral estate to another; or the right to receive bonus, delay, or royalty payments. At most, the Agreements provide Nordheim and HPIP the contractual right to transport, process, and return Sabine's personal property: gas and condensate Sabine has severed from its estate and delivered to Nordheim and HPIP. This contractual right does not constitute a real property interest in the mineral estate, and its conveyance cannot satisfy the privity requirement.

#### *ii. The Conveyance of the Nordheim Surface Parcel Does Not Satisfy the Horizontal-Privity Requirement.*

As noted, "under Texas law [a] covenant may only validly be created as part of the conveyance of an interest in the land burdened with the covenant." *El Paso Nat. Gas*, 1992 WL 43925, at *11 (citing *Clear Lake*, 537 S.W.2d at 51). The Objectors argue that the Transportation Commitments burden and run with Sabine's mineral estate. Consol. Br. 11. Thus, to satisfy the privity of estate requirement, Nordheim must show a conveyance of an interest in the same property with which the Transportation Commitments run.

On March 11, 2014, Sabine conveyed to Nordheim the Nordheim Surface Parcel—separate from and subsequent to entering into the Nordheim Agreements—for purposes of conveniently locating its gathering facility. Nord. Dkt. 12 ¶ 8. That parcel was long ago severed, in its chain of title, from any mineral estate. Nord. Dkt. 12 ¶ 9. The real property the

---

[14] Again, Sabine could not have conveyed an interest the underlying mineral estate in the Nordheim Agreements because it did not own any interest in the mineral estate itself. The mineral estate at issue is Sabine South Texas's fee simple determinable ownership interest in the mineral estate.

Objectors allege to be burdened by the Transportation Commitments, however, is certain unrelated mineral estates. Consol. Br. 11. Because the property conveyed to Nordheim included only a surface parcel—separate and distinct from any mineral interest at issue—there cannot be any privity of estate for a covenant that purportedly runs with a mineral estate.

***iii. The Conveyance of the Nordheim Pipeline Easement Does Not Satisfy the Horizontal-Privity Requirement.***

Sabine also granted Nordheim a Pipeline Easement for the construction of two pipelines and one electrical utility line. Nord. Dkt. 12 ¶ 10. Because this easement does not implicate any mineral interest, it cannot constitute the conveyance of any property right in a mineral estate. In turn, conveyance of this easement similarly cannot satisfy the privity requirement because the conveyance did not involve the same interest with which the covenant purports to run—the mineral estate.

Nordheim's reliance on *Clear Lake* to support its argument that the conveyance of the Pipeline Easement satisfies horizontal privity is unavailing. Consol. Br. 19-20. In that case, the court found that a contract to furnish water and sewer service "did not create any privity of estate [because] it was not part of any transaction ***conveying the land involved***, or any easement ***in it***, between the parties." *Id.* at 51 (emphasis added). Similarly, the easement here simply granted Nordheim the right to install and maintain a gathering system, and not the right to any underlying mineral rights; the easement was not ***in*** the mineral estate. As a result, the easement cannot constitute the necessary conveyance for the purposes of horizontal privity.

*Ball v. Rio Grande Canal Co.*, 256 S.W. 678 (Tex. Civ. App.—San Antonio 1923, writ ref'd) is similarly inapposite.[15] Consol. Br. 20. In that case, a contractual agreement for a water

[15] There are a number of additional meaningful distinctions between *Ball* and this case: Most importantly, *Ball* concerned the furnishing of water, and not oil or gas. Under Texas law,

company to provide water from its canals at an agreed price for irrigation purposes was held to be a covenant running with the land. *Id.* at 682. Importantly, the *Ball* court held that privity of estate was satisfied because the contractual agreement conveyed an easement in favor of the contiguous lands against the irrigation company's canals and levies, subject to an obligation by the owners of the adjoining land to pay yearly water charges. *Id.* Privity of estate existed because the obligation at issue—yearly water charges—burdened the real property interest contemporaneously conveyed—the easement on the irrigation companies canals and levies. *Cf. Tidal*, 264 S.W. at 340 (citing *Ball*, 256 S.W. 678).

Here, by contrast, the easement conveyed does not involve the mineral estate, which is the real property interest that is purportedly burdened by the Transportation Commitments at issue. *See* Consol. Br. 11. Instead, the easement conveyed is in a separate surface estate unrelated to the real property interest and obligation at issue. Therefore, the conveyance of the Pipeline Easement cannot establish horizontal privity under Texas law.

#### *iv. The HPIP and Nordheim Agreements Do Not Convey a Profit á Prendre.*

Nordheim and HPIP also claim, for the first time on appeal, that the Agreements created a profit á prendre. *See* Consol. Br. 21-23; HPIP Br. 15 n.12. Again, they are wrong. In Texas, the "right to profits, denominated 'profit a prendre,' consists of a right to take a part of the soil or produce of the land, in which there is a supposable value." *Anderson v. Gipson*, 144 S.W.2d

---

water that has been diverted into ditches or into pipes for irrigation purposes (as in *Ball*) is held to be realty. Oil or gas, however, once severed from the land (as is the case here) becomes personal property. *Compare American Ref. Co. v. Tidal W. Oil Corp.*, 264 S.W. 335, 340 (Tex. Civ. App. 1924), *with Sabine*, 596 S.W.2d at 276). A contractual right to take another's real property (*i.e.*, irrigation water from a canal or levy) is substantively different from a contractual right to transport one's personal property (*i.e.*, oil severed from a mineral estate) from point A to point B.

948, 951 (Tex. Civ. App. 1940). Profits á prendre include "rights to take from another's land, and so acquire as one's own, wood, herbage, coal or other minerals ...." 3 TIFFANY REAL PROPERTY § 839. "A grant of [a profit á prendre] must be itself strictly construed and cannot be extended beyond the terms of the instrument itself." *Bland Lake Fishing & Hunting Club v. Fisher*, 311 S.W.2d 710, 715 (Tex. Civ. App. 1958); *see also Anderson*, 144 S.W.2d at 950.

Neither HPIP nor Nordheim holds a profit á prendre in the gas and condensate from Sabine's mineral estate. The Agreements do not convey the right to sever and take title to gas and condensate from Sabine's estate; instead, as noted above, these provide for the transportation and processing of the gas and condensate Sabine severs from its mineral estate and delivers to the Objectors. They do not convey to the Objectors title to any of Sabine's severed gas and condensate or the right to come onto Sabine's property and take or exploit—as its own—any part of the soil or product of its land.[16]

If the Objectors truly held a profit á prendre for Sabine's gas and condensate, they would have the right not only to transport the gas and condensate severed from the ground and delivered to them by Sabine at the designation point, but they would also have the right to sever the gas from the mineral estate themselves and take the gas and condensate for their own. *See* 3 TIFFANY REAL PROPERTY at § 839. The Agreements cannot be read to have intended to convey

---

[16] This becomes even more evident when considering an identical, hypothetical agreement for the transportation and processing of timber (which, as described above, is commonly the subject of a profit á prendre) instead of gas and condensate: Sabine owns a surface estate in Texas with valuable timber. It enters into a services agreement with HPIP in which HPIP has the exclusive right to transport Sabine's timber from its property to be processed into lumber. In accordance with the services agreement, HPIP builds a road onto Sabine's property to a designated pickup point. At this designated location, Sabine agrees to provide HPIP with a minimum yearly volume of timber it has severed from its land. If it fails to do so, Sabine will pay an additional fee. At no point throughout HPIP's performance under the contract does it have title to Sabine's timber or processed lumber, such that HPIP could enter Sabine's property, chop down trees, and take the timber as its own—which is what a profit a prendre would permit.

this right. In fact, they expressly reject it.[17] A contractual obligation to transport the product of another's land substantively differs from the right to take that product as one's own.

The cases relied on by the Objectors do not support that the Agreements convey a profit á prendre. Consol. Br. 21-23. All of those cases involve a contractual agreement to ***purchase*** all of the oil or gas produced from a mineral estate or lease.[18] In each case, the party who purchased the gas or oil produced from the mineral estate was also conveyed the right to enter the surface estate and take the product of the land—as their own—straight from the wellhead, or straight from the mineral estate.[19] Because the purchasing parties in those cases held title to all oil and gas produced from the land, as well as the right to enter on the land to remove that oil and gas from the estate, the courts held that the rights held by the purchaser could be considered profits á prendre.[20]

The Objectors, however, have not purchased any—let alone all—of the gas and condensate produced or contained in the mineral estate, nor have they been granted a right to

[17] *See* HPIP Gathering Agreement, Appx. § 4 ("Title to all [of Sabine's produced oil and gas] shall at all times remain with [Sabine]."); Nordheim Agreements, Appx. § 3.7 ([Oil and gas within the Nordheim Dedicated Area] shall remain with and in [Sabine] or its customers at all times.").

[18] *See Sw. Pipe Line Co. v. Empire Natural Gas Co.*, 33 F.2d 248, 249–50 (8th Cir. 1929) ("[The Parties] entered into a contract ... by the terms of which it purchased at the mouth of the wells upon a certain leasehold ... all the merchantable gas in its natural state as produced from wells then existing upon the leasehold or thereafter drilled."); *Tidal*, 264 S.W. at 336; *Graham v. Omar Gasoline Co.*, 253 S.W. 896, 898–99 (Tex. Civ. App.—Fort Worth 1923, no writ).

[19] *See Sw. Pipe Line*, 33 F.2d at 252; *Tidal*, 264 S.W. at 335-38; *Graham*, 253 S.W. at 899 ("[I]t is a fair inference from this contract that the [purchaser of the gas] was to go upon the land and connect its pipes directly with the oil well thereon, and by means of vacuum extract the gas therefrom which would, perhaps, not otherwise be produced.").

[20] *See Sw. Pipe Line*, 33 F.2d at 252-53; *Tidal*, 264 S.W. at 340-41 (purchase agreement and associated rights conveyed an interest in land for the purposes of equity but reserving judgment whether that interest is a profit á prendre); *Graham*, 225 S.W. at 899 ("Viewed in this light, the contract becomes in the nature of a grant of a profit á prendre ....").

take, as their own, this gas and condensate straight from the mineral estate or the wellhead. The Agreements do not convey the right to take or exploit the gas and condensate from Sabine's estate, and thus they did not convey to the Objectors a profit á prendre. The privity requirement remains unmet.[21]

### *3. The Nordheim Agreements Lack Any Element of "Vertical" Privity.*

HPIP and Nordheim each devote significant space in their respective Objections to the distinction between vertical and horizontal privity, ignoring entirely the requirement for a conveyance of a real property interest and arguing that only vertical privity is required for a covenant to run with the land. The absence of a conveyance of a real property interest alone is sufficient to defeat the Objectors' running with the land arguments, but Nordheim's argument also fails with respect to the "vertical" element of privity. Vertical privity under Texas law requires the succession of ownership of the burdened property. *See Wasson*, 405 S.W.3d at 973. The Debtors' oil and gas leases located in the Nordheim Dedicated Area are owned by Sabine South Texas LLC, not by Sabine. Sabine South Texas LLC is not a party to the Nordheim Agreements and has not conveyed these interests to Sabine. Accordingly, there is no succession of ownership—from Sabine South Texas LLC to Sabine—of the burdened property, and thus the vertical privity requirement is not satisfied.

[21] Even if, *arguendo*, a profit á prendre was conveyed by the Agreements, the Objectors cite no case law for the proposition that such an interest is sufficient to establish privity such that the covenants run with the land. *See Tidal*, 264 S.W. at 341 (pretermitting whether the purchase agreements create covenants that run with the land); *Graham*, 253 S.W. at 899 ("[I]t is immaterial in such cases whether the covenants run with the land or not ....");

**B. The Transportation Commitments Do Not Touch and Concern the Land.**

The Transportation Commitments are not covenants that run with the land for the additional and independent reason that they do not "touch and concern" the burdened land. *See Inwood*, 736 S.W.2d at 635; *Wayne Harwell Props*., 945 S.W.2d at 218.

The "tests involved in making th[e] determination" as to whether a covenant touches and concerns the land "are far from absolute," but the Texas Supreme Court has pointed to two "tests" that have emerged over time. *Westland*, 637 S.W.2d at 911. The first test considers whether the covenant "affected the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affected the mode of enjoying it." *Id.* The second evaluates whether "the promisor's legal relations in respect of the land in question are lessened ... and the promisee's legal relations in respect to the land are increased ...." *Id.* (internal citation omitted).

Not every commitment that impacts the value of land necessarily touches and concerns the land under these tests: "[E]ven when a covenant impacts the value of land, it must still affect the owner's interest in the property or its use in order to be a real covenant." *In re El Paso Refinery, LP*, 302 F.3d 343, 357 (5th Cir. 2002) (citing 16 Tex. Jur. 3d *Covenants, Conditions, & Restrictions* § 10 (2002) ("Covenants that do not relate to, or concern, the property or its use or enjoyment are purely personal and do not run with the land so as to bind subsequent assignees.")). Thus, a covenant that concerns personal—rather than real—property cannot touch and concern the land because, by definition, it affects the owner's interest in or use of personal property.

As the Bankruptcy Court recognized, the Transportation Commitments flunk both of these tests: they affect neither the value of the land nor any interest in the Debtors' real property.

***1. The Transportation Commitments Do Not Impact the Value of the Land Independently of Collateral Circumstances.***

The Transportation Commitments do not impact the value of Sabine's mineral estate independently of collateral circumstances. The Objectors argue that these Commitments "make [the mineral interests] more or less valuable, depending on the price of hydrocarbons and the market rates for gathering at a particular time." Consol. Br. 15. In other words, as commodity prices rise and fall, and the market rates for the services covered by the Agreements adjust to that change, the value of having a contractual right to these services at a set price will change.

This alleged impact on value fails to meet the test for touching and concerning the land because it is not independent of collateral circumstances. The value of the Transportation Commitments is entirely dependent upon commodity prices and the market rate for the agreed-to services, which are circumstances collateral to the Transportation Commitments themselves. Indeed, the proposed value is so dependent on circumstances collateral to the Commitments themselves that, depending on market conditions, they could be of great benefit, great detriment, or no value at all, with no alteration at all to the Commitments themselves.

Moreover, the Transportation Commitments do not impact the value of the mineral estate. At most, they affect Sabine. The price at which Sabine can transport and process its gas and condensate does not affect the value of the minerals in the ground; rather, that price impacts Sabine's potential profit in processing and selling those minerals once extracted. The value of the mineral estate, as the Objectors themselves highlight, is largely dependent on commodity prices, not the Transportation Commitments. *See* Consol. Br. 15.

Even if the Transportation Commitments impacted the value of the land independently of collateral circumstances, they would not touch and concern the land because those Commitments do not affect "the owner's interest in the property or its use." *El Paso Refinery*, 302 F.3d at 357. The Transportation Commitments do not burden, or affect, Sabine's property interests because

those Commitments do not concern—and are not triggered by—an action affecting the land itself, but rather by the Objectors' receipt of the gas and condensate that is severed from the land. *See*, *e.g.*, HPIP Gathering Agreement § 5.1; Nordheim Agreements § 5.1. This is a key distinction. *See, e.g.*, *El Paso Refinery*, 302 F.3d at 357 ("*Westland Oil* is distinguishable because the party's obligations under the covenant were triggered by an action affecting the land itself.").

This distinction remains important even where minimum volume commitments are concerned because the obligations for payment or transportation are not triggered by extraction—contrary to the Objectors' assertion, Consol. Br. 14—but by the Objector's receipt of the already extracted gas and condensate. The amount to be paid or transported cannot be determined unless and until an accounting of the amount that is delivered by Sabine to HPIP and Nordheim, if any, may be determined. Under the Agreements, Sabine could extract hydrocarbons and opt not to transport or deliver those hydrocarbons to the Objectors. The act of extracting these hydrocarbons does not affect or trigger any Transportation Commitment under the Agreements.

Because the Transportation Commitments do not "compel []or preclude [the owner, Sabine] ... from doing anything on the land itself," they cannot be said to affect the land's value independently of collateral circumstances. *Id.* at 356-57.

### *2. The Transportation Commitments Concern Personal Property, Not Real Property, and Thus Do Not Affect Sabine's Rights in the Land.*

The fact that the Transportation Commitments concern the gas and condensate that Nordheim and HPIP receive from Sabine means that those Commitments do not touch and concern the land for an additional reason: they affect rights in ***personal***, not ***real***, property. A commitment to use another's exclusive services to transport or process extracted minerals for a

fee does not affect the mode of enjoying the underlying mineral estate because it does not affect any of the five mineral rights or interests recognized under Texas law and described in Section I(A)(2)(b)(i) above. At most, it affects the mode of enjoying the severed gas and condensate—Sabine's personal property. Indeed, the Agreements expressly state that they do not impose any limitations on Sabine's use of the mineral estate or the production of the mineral estate. *See* Nordheim Agreements § 1.4; HPIP Gathering Agreement, Appx. § 3.B. A covenant that affects only personal property cannot affect rights in real property and, therefore, cannot touch and concern land.[22]

Once minerals are produced, they cease to be real property and instead become personalty. *See Sabine*, 596 S.W.2d at 276 ("Once minerals have been severed from the reservoir or strata wherein they were originally contained, such minerals ... become personalty."); *Colo. Interstate Gas Co.*, 47 S.W.3d at 10 ("Once oil or gas has been severed from the ground, it becomes personalty."); *see generally supra* Section I(A)(2)(b)(i). As such, the

[22] HPIP argues that the HPIP Gathering Agreement affects the mode of enjoying the mineral estate because it "restricts Sabine from transferring its interests in the Leases unless the transferor assumes the HPIP Gathering Agreement and the Acreage Dedications contained therein." Consol. Br. 10. As an initial matter, HPIP failed to raise this argument in the summary judgment proceedings, so it is waived. *See, e.g.*, *In re Schick*, 1998 WL 397849, *7 (S.D.N.Y. July 16, 1998) (holding that arguments raised for the first time in district court on appeal from bankruptcy court are not properly before the district court). In any event, the case on which HPIP relies for this proposition, *In re Energytec*, is distinguishable from the present case for reasons specified by the Bankruptcy Court. *See* Main Dkt. No. 872. Specifically, *Energytec* involved a right to consent to a lease assignment, which the Court noted "restricted the landowner's rights of alienation of its property." No such consent restriction is at issue here. Main Dkt. No. 872 at 16. It is simply not the case that every restriction in a lease touches and concerns the land. Furthermore, *Energytec* is distinguishable from the present case because the horizontal privity requirement in that case was unequivocally satisfied. 739 F.3d at 222-23. The court determined specifically that the "transportation fee and other benefits [*i.e.*, the relevant covenants] ... *were created at the time of a conveyance of real property*," thus satisfying the horizontal privity requirement. *Id.* at 223 (emphasis added). There was no such conveyance here. *See supra* Section I.

Nordheim and HPIP Agreements have "no direct impact on the land itself." *See El Paso Refinery,* 302 F.3d at 356 (holding that an allocation of personal liability for environmental costs associated with a parcel of land does not touch and concern the land under Texas law).

The Objectors attempt to circumvent this conclusion by claiming that the "produced and saved" language in the Agreements means that their alleged "right to the gas from Sabine's wells once produced is a real property interest in minerals in place." Consol. Br. 12. The cases the Objectors cite to support that proposition, however, are cases in which the real property interest is a royalty interest, not some separate mineral interest created by the words "produced and saved." The Objectors do not appear to—and cannot—claim a royalty interest, or a right to royalty payments, in Sabine's minerals, nor can they claim any of the other four interests or real property rights in mineral estates that exist under Texas law. *See supra* Section I(A)(2)(b)(i). None of the cases the Objectors cite support their assertion that an agreement for the transportation, processing, and return of another's gas for a fee affects the mode of enjoying a mineral interest or touches and concerns the land. *See* Consol. Br. 11-14.

For example, the Objectors cite *Miller v. Speed*, 248 S.W.2d 250, 252 (Tex. Civ. App. 1952) for the proposition that the "produced and saved" language in the Agreements gives them an ownership interest in Sabine's real property. *See* Consol. Br. 12. Not so. The *Miller* court expressly held that the relevant language in that case—"1/24 of all oil, gas and other minerals produced, saved, and made available for market"—established a 1/24 "royalty" but "***not an interest in the minerals in place under the ground*** ...." *Id.* (emphasis added). *Miller* explicitly rejects the Objectors' assertion that, despite having no royalty, theirs is a real property interest in minerals under the ground or "in place."

Furthermore, as the Objectors themselves recognize, "[o]wnership" of "gas and oil in place means having the ***exclusive*** right to possess, use, and dispose of gas and oil." Consol. Br. 11 (citing *Stephens Cnty. v. Mid-Kansas Oil & Gas Co.*, 254 S.W. 290, 292 (Tex. 1923)) (emphasis added). The Nordheim and HPIP Agreements cannot plausibly be read to convey such broad rights to the gas and condensate in Sabine's mineral estates; otherwise, Sabine would not have the right to exploit or possess the very gas and condensate it is to deliver to the Objectors under the Agreements and to which Sabine expressly retains title. *See supra* Section I(A)(2)(b)(iv).

The other cases that the Objectors cite for this same proposition are likewise inapposite. *See* Consol. Br. 12-14. None of those cases considered or discussed the "produced and saved" language or whether an agreement for the transportation and processing services touched and concerned the mineral estate from which those minerals were extracted.

*Prochemco, Inc. v. Clajon Gas Co.*, 555 S.W.2d 189 (Tex. Civ. App. 1977), for example, concerned a landowner's covenant to "purchase gas for utilization as the total power requirements for the lifting of water for use in the irrigation of land." *Id.* at 191. The question there was whether this covenant to gas ran with the land where the gas was to be used to power irrigation, not whether it ran with the mineral estate from which the gas was severed. *Id.* at 190-91. The court did not base its decision that the covenant ran with the land on the personal/real property distinction because the property at issue was a fee simple in the surface estate, which is clearly real property. *Id.* Moreover, the court did not provide any analysis as to the "touch and concern" prong. *Prochemco* does not support Objectors' assertion that the Transportation Commitments touch and concern the mineral estate.

Similarly, *Tidal* and *Simms v. S. Pipe Line Co.*, 195 S.W. 283 (Tex. Civ. App. 1917), both involved contracts for the sale of oil or gas in the ground, not the right to gather and deliver those products.[23] Put differently, the covenants at issue involved the transfer of title to oil and gas that was still in the ground, not simply, as here, the contractual right to transport, process, and return someone else's (Sabine's) personal property. Whereas the sale of a real property interest certainly affects the seller's rights to that property interest, the same cannot be said about the Transportation Commitments: Sabine's temporary loss of possession of its extracted oil and gas condensate does not affect its rights to the underlying mineral estate.

*Montfort v. Trek Resources, Inc.*, 198 S.W.3d 344 (Tex. App. 2006), involved a covenant to provide water that was never separated from the land. In Texas, water that has been extracted or diverted is held to be realty. *See Tidal*, 264 S.W. at 340. Oil or gas, by contrast, once severed from the land (as here) becomes personal property. *See Sabine*, 596 S.W.2d at 276. Consequently, the issue in *Montfort* of whether covenants related to the furnishing of water—real property—"touch and concern" the land is irrelevant to the issue here of whether commitments to transport produced oil and gas—personal property—do so.

As the Bankruptcy Court explained, "[b]y the plain terms of the Nordheim Agreements and the HPIP Agreements, the mineral dedications concern only minerals extracted from the ground, which indisputably constitute personal property, not real property, under Texas law." Nord. Dkt. 20 at 9.

---

[23] In addition, the subject of the covenant in *Tidal* was gas ***in place***, whereas the issue here is ***produced*** products. 264 S.W. at 339 ("[A] fair construction of the contract shows that they referred to and that the parts were dealing with gas in place ....").

### C. The Objectors Cannot Demonstrate that the Parties Intended to Create Covenants Running with the Land.

"In attempting to ascertain the intention of the parties [to an alleged restrictive covenant, a court] must look to the entire instrument in the light of the stated covenant." *Billington v. Riffe*, 492 S.W.2d 343, 346 (Tex. Ct. App. 1973). The Objectors cannot demonstrate—based on the entirety of the Agreements—that the parties clearly intended to create a covenant that runs with the land. Nothing in the Agreements identifies either Nordheim or HPIP as a grantee of any property interest, and there is no language of conveyance—such as a "grant," "sale," or "assignment"—of an "interest in" any leasehold, fee, or other property estate. *See supra* Section I(A)(2)(a). Instead, Sabine expressly retains title in the Agreements to its real property. *See id.* Moreover, if the parties intended to transfer a real property interest in the mineral estate, then the Objectors would have had to obtain releases, or at least assurances, in order to confirm that the real property they were receiving was free of Sabine's legacy lenders' liens. Nordheim and HPIP never did this because no transfer of a real property interest was intended.

### D. The Objectors' Policy Arguments Are Misguided.

At bottom, the Objectors' position boils down to a policy argument: they relied on these executory contracts to their detriment, and it is unfair to reject them. *See* Consol. Br. 2. But the Bankruptcy Code specifically allows the rejection of executory contracts and their component performance obligations, *see* 11 U.S.C. § 365(a), regardless of the reliance interests involved, except insofar as they create a real property interest. In the absence of a real property interest under Texas law, the Objectors cannot claim any justifiable reliance.

Ultimately, as in so many bankruptcy disputes, the real dispute here involves the priority among creditors. The Objectors are unsecured creditors. By seeking to keep in place a substantial encumbrance on the reorganized debtor, the Objectors are essentially seeking to place

their own interests ahead of those of the more senior secured creditors who received virtually all of the equity in the reorganized Debtors. Ultimately, the Objectors are searching for a loophole to allow midstream gatherers, unlike all other participants in the oil and gas industry, to immunize themselves from industry-wide credit risk. Such a result would undermine institutional secured lending by permitting collateral to be removed from secured lenders' borrowing base without their consent.

Thus, it is the Objectors here who seek a "massively unfair and disruptive" outcome, Consol. Br. 2, by shifting the costs of rejection to the secured creditors. Nothing in the decision below purports to set rules for the industry. While it might be true that certain oil and gas agreements—specifically, those that contemplate an actual transfer of an interest in a mineral estate from a grantor to a grantee—can create covenants running with the land, this is a case-by-case and contract-by-contract inquiry.

## II. THE TRANSPORTATION COMMITMENTS DO NOT CONSTITUTE EQUITABLE SERVITUDES.

Under Texas law, an equitable servitude exists only if the covenant in question both (1) "limits the use of the burdened land" and (2) "benefits the land of the party seeking to enforce it." *Reagan*, 96 S.W.3d at 495.[24] Neither element is satisfied here. Thus, as the Bankruptcy Court held, the covenants in the Agreements do not constitute equitable servitudes as a matter of law.

[24] In order to enforce an equitable servitude, the successor to the burdened land must also have taken its interest with notice of the restriction. This requirement, however, is not at issue here because there is no dispute that Sabine, as an original party to the Agreements, would have notice of the alleged restriction if the Transportation Commitments created an equitable servitude.

**A. The Transportation Commitments Do Not Limit the Use of the Land.**

HPIP and Nordheim cannot satisfy the first element required for an equitable servitude because the Transportation Commitments do not limit the use of the purportedly burdened land. The Objectors contend that the Agreements create a "burden" by limiting Sabine's use of its "Interests," meaning Sabine's title to or interest in the land and its right to produce gas therefrom. *See* Consol. Br. 11, 24; HPIP Br. 18. The Agreements impose no such limitations. The Nordheim Agreements specifically state that Sabine reserves the right "to operate its Interests free from any control by Gatherer and in a manner as Shipper, in its sole discretion, may deem advisable." Nordheim Agreements § 1.4. Similarly, the HPIP Agreements state that Sabine shall "operate the Leases free of any control by Gatherer." HPIP Gathering Agreement, Appx. § 3.B. By their express terms, the Agreements impose no limitations on Sabine's use of the mineral estate or the production from the mineral estate.

Furthermore, the Transportation Commitments relate only to personal property—the minerals severed from the estate, and not the mineral estate itself. *See supra* Section I(B)(2); *see also Riley*, 972 S.W.2d at 155 (citing *Phillips Petroleum*, 513 F.2d at 363) ("Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production."). The Transportation Commitments do not apply to the "burdened land," much less "limit[] the use of the burdened land," as required to establish an equitable servitude. *Reagan*, 96 S.W.3d at 495.

Under analogous facts, the Texas Supreme Court in *Clear Lake City Water Authority v. Clear Lake Utilities*, 549 S.W.2d 385, 388 (Tex. 1977), rejected an argument that an exclusive water and sewer service contract created an equitable servitude. *Id.* at 392. In that case, Clear Lake Utilities Company argued that its contract to be the exclusive provider of water and sewer

services to North Clear Lake Development Corporation ("NCL") represented an equitable servitude that was binding on a successive owner of the property. *See id.* at 387-88. The Court held that the equitable servitude doctrine "has application only to promises respecting the use of land," so the bar against contracting with alternative water and sewer providers did not create an equitable servitude:

> Enforcement of the exclusive service provision would not have restricted NCL in the use of its real property .... At most, NCL's promise limited NCL's freedom to contract with other suppliers of water and sewer service. Such a limitation affects the use of land only collaterally and will not create an equitable servitude upon the land.

*Id.*; *see also Superior Phones, Ltd. v. Cherokee Commc'ns, Inc.*, 964 S.W.2d 325 (Tex. App. 1998) (holding that an agreement which granted one party the exclusive right to provide pay telephone services for a particular property was not an equitable servitude because, at most, the agreement limited the landowner's freedom to choose a pay telephone service provider for the premises and only collaterally limited the use of the real property).

Similarly, the Objectors cannot create equitable servitudes based on their contractual rights to perform services that relate to real property. Those rights to provide transportation services do not limit Sabine's use of its land. At most, they limited how Sabine could transport gas and condensate once Sabine severed those minerals from the land.

### B. The Transportation Commitments Benefit HPIP and Nordheim, Not the Land.

Separately and independently, the Transportation Commitments cannot constitute equitable servitudes because they do not "benefit[] the land of the party seeking to enforce it." *Reagan*, 96 S.W.3d at 49. The Transportation Commitments benefit the Objectors personally, not the land of the parties seeking to enforce these commitments. Under the Agreements, the

Objectors have a contractual right to gather the gas and condensate produced from a specified area, and to receive a fee for performing that service. The Agreements provide no special rights or benefits to the Nordheim Surface Parcel, the Pipeline Easement, or HPIP's Facilities. There is no benefit to any particular tract of land: Even if the Objectors were to relocate their facilities, the Agreements would still obligate Sabine to deliver a minimum volume of its severed gas and condensate or pay a fee. That benefit to HPIP and Nordheim is not a benefit to their land. As the Bankruptcy Court properly held, the Agreements do not create an equitable servitude.

## III. THE BANKRUPTCY COURT CORRECTLY ALLOWED THE REJECTION OF THE NORDHEIM AGREEMENTS.

Nordheim challenges the Bankruptcy Court's ruling that Sabine could reject the Nordheim Agreements under 11 U.S.C. § 365(a) solely on the ground that the Nordheim Agreements "create a real property interest"—covenants that run with the land. *See* Consol. Br. 24-25. Because, as explained above, the Nordheim Agreements do not create covenants that run with the land—or any other real property interest—this Court should affirm the Rejection Order.

## CONCLUSION

For the reasons discussed herein, Debtors respectfully Request that this Court affirm the Bankruptcy Court's reasoned decisions.

Dated: September 6, 2016
New York, New York

*/s/ Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

**CERTIFICATE OF SERVICE**

I, Ryan Blaine Bennett, hereby certify that on September 6, 2016, I caused the foregoing papers to be served on all counsel of record in this matter through the ECF system.

Dated: September 6, 2016

Respectfully submitted,

*/s/ Ryan Blaine Bennett*
Ryan Blaine Bennett
*Attorney for Sabine Oil & Gas Corporation*