```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
IN SABINE OIL & GAS CORP., et al.,    :    Bankr. Nos. 15-11835,
                                      :    16-01042 & 16-01043(SCC)
                 Debtors.             :
-------------------------------------x
HPIP GONZALES HOLDINGS, LLC,          :
                                      :
                 Appellant,           :
                                      :    16-cv-4127 (JSR)
         -v-                          :
                                      :    16-cv-4132 (JSR)
SABINE OIL & GAS CORP., et al.,       :
                                      :
                 Appellees.           :
-------------------------------------x
NORDHEIM EAGLE FORD GATHERING, LLC    :
                                      :
                 Appellant,           :    16-cv-4615 (JSR)
                                      :
         -v-                          :    16-cv-4616 (JSR)
                                      :
SABINE OIL & GAS CORP., et al.,       :
                                      :    MEMORANDUM ORDER
                 Appellees.           :
-------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Pending before this Court are the consolidated appeals of HPIP
Gonzales Holdings, LLC ("HPIP") and Nordheim Eagle Ford Gathering,
LLC ("Nordheim") (collectively "appellants") from three orders by
Judge Chapman of the bankruptcy court in the Chapter 11 action of
debtor-appellee Sabine Oil & Gas Corp. ("Sabine") and adversary
proceedings between each of the appellants and Sabine. The
bankruptcy court determined that appellants' agreements with Sabine
to provide gathering services did not run with the land under Texas
property law, and therefore it granted Sabine's motion to reject the
agreements as executory pursuant to 11 U.S.C. § 365(a). The Court

now affirms the bankruptcy court's decision for the reasons explained below.

Presuming familiarity with the underlying record and bankruptcy court proceedings, the Court provides a brief overview of the procedural and factual background relevant to this appeal. This dispute arises out of agreements that Sabine, an energy company that explores and develops onshore oil and natural gas properties, entered into with HPIP and Nordheim, "midstream gatherers" that gather, transport, and process oil and gas after they have been extracted from land but before they are refined.

On January 23, 2014, Sabine and Nordheim entered into two substantially similar agreements: the Gas Gathering Agreement, which concerned natural gas, and the Condensate Gathering Agreement, which concerned liquid hydrocarbons (collectively, the "Nordheim Agreements"). See Bankr. Case No. 16-01043, Dkt. 21 Ex. A, B.[1] In each agreement, Sabine "dedicate[d] for gathering and dehydration" and agreed to deliver to Nordheim "all [gas and condensate] produced and saved . . . from wells . . . located within the Dedicated Area," a specified area of land in which Sabine held leases (the "Nordheim

---

[1] All references in this Memorandum Order to a document in the docket of the adversary proceedings in the bankruptcy court initiated by Sabine against Nordheim, Bankr. Dkt. No. 16-01043, are indicated as "Nordheim Dkt.," followed by the document number. Similarly, documents from the adversary proceedings in the bankruptcy court initiated by Sabine against HPIP, Bankr. Dkt. No. 16-01042, are indicated using "HPIP Dkt.," and those from Sabine's Chapter 11 bankruptcy proceedings, Bankr. Dkt. No. 15-11835, are indicated using "Ch. 11 Dkt."

Dedicated Area"). Nordheim Dkt. 21, Ex. A at § 1.1. In other words, Sabine agreed to deliver all of the gas and condensate it produced from a particular area to Nordheim. In exchange, Nordheim agreed to receive, treat, dehydrate, and then re-deliver the gas and condensate to Sabine. Id. at § 2.3. Sabine agreed to pay gathering fees for Nordheim's services and to make a "Deficiency Payment" if it failed to deliver a certain minimum volume of gas and condensate each year. Id. at §§ 1.9, 5.1. The Nordheim Agreements expressly state that title to the gas and condensate remains with Sabine, that the agreements shall be "covenant[s] running with [Sabine's] Interests" in the Nordheim Dedicated Area, and that the agreements are binding on Sabine's successors and assigns. Id. at § 1.6, App'x § 3.7.

In addition, the Nordheim Agreements contemplate a separate and subsequent conveyance from Sabine to Nordheim of a tract of land on which Nordheim could construct the facilities and pipelines needed for its gathering services. On March 11, 2014, Sabine conveyed to Nordheim approximately 17 acres of a 38-acre surface tract adjoining the Nordheim Dedicated Area, as well as a 90-foot pipeline and electrical easement over the remaining 21 acres of the surface tract. See Nordheim Dkt. 21, Ex. C.

Sabine also entered into two similar agreements with HPIP (collectively, the "HPIP Agreements"). On May 3, 2013, Sabine and HPIP entered the Production Gathering, Treating and Processing Agreement (the "HPIP Gathering Agreement"). HPIP agreed to perform

gathering services with respect to all of the oil, gas, and water produced by Sabine from a "Dedicated Area" over which Sabine held certain leases (the "HPIP Dedicated Area"), and to construct the facilities required for those services. Br. of Appellant HPIP Gonzales Holdings, LLC ("HPIP Br."), Ex. 1 at § 2.1, ECF No. 11. In exchange, Sabine "dedicate[d] and commit[ted] to the performance of this Agreement the Leases and all of [Sabine]'s owned or controlled Production produced and saved from [Sabine]'s operated Wells located on the Leases," and "covenant[ed] to deliver the same to [HPIP]." Id. at § 1.2. Sabine also agreed to pay fees for HPIP's processing services. Id. at § 5. Like the Nordheim Agreements, the HPIP Gathering Agreement expressly states that Sabine retains title to the leases in question, that the agreement "constitute[s] a real right and covenant running with the lands and leasehold interests" that it covers, and that the agreement is binding on the parties' successors. Id. at §§ 9.2.1, 9.3. Moreover, it provides that Sabine may not transfer its interests in the leases unless the purchaser agrees to be bound by the agreement. Id. at § 9.2.2. A memorandum of the agreement was recorded in Wilson County, Texas, and Gonzales County, Texas. See HPIP Dkt. 8, Ex. 3.[2]

---

[2] The Water and Acid Gas Handling Agreement, which Sabine and HPIP entered into in May 2014 and which deals with the disposal of water and acid gas produced within the HPIP Dedicated Area, contains substantially similar language to the HPIP Gathering Agreement and therefore the parties' briefing focuses only on the latter. See Consolidated Br. of Appellants ("Consolidated Br.") 4 n.9, ECF No. 14.

On July 15, 2015, Sabine and various affiliates (collectively the "Debtors") filed for bankruptcy under Chapter 11 of the Bankruptcy Code. Ch. 11 Dkt. 1. On September 30, they filed a motion to reject the HPIP Agreements and the Nordheim Agreements (collectively, the "Agreements") pursuant to § 365(a) of the Bankruptcy Code. Debtors' Omnibus Mot. for Entry of an Order Authorizing Rejection of Certain Executory Contracts, Ch. 11 Dkt. 371. Each of the appellants objected to the motion on the ground that the Agreements could not be rejected because they contained covenants that run with the land. On March 8, 2016, the bankruptcy court rejected appellants' arguments and granted the rejection motion. Bench Decision on Debtors' Omnibus Motion to Authorize Rejection of Certain Executory Contracts, Ch. 11 Dkt. 872.

However, the bankruptcy court decided that it was unable to make a definitive decision on substantive legal issues, including whether the covenants at issue run with the land, in the procedural context of a motion to reject, which deals only with whether the trustee or debtor prudently decided to reject a given contract. See id. at 7 (citing Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993)).

Accordingly, the Debtors commenced adversary proceedings against each of the appellants seeking declaratory judgments that the covenants contained in the Agreements do not run with the land. Compl. for Declaratory J., HPIP Dkt. 1; Compl. for Declaratory J., Nordheim Dkt. 1. Appellants each asserted counterclaims for

declaratory judgments affirming the opposite. Answer, Affirmative
Defenses and Countercls., HPIP Dkt. 8; Answer to Compl. for
Declaratory J. and Countercls. for Declaratory J., Nordheim Dkt. 5.
Each of the appellants moved for judgment on the pleadings with
respect to the Debtors' declaratory judgment claims and their own
counterclaims, while the Debtors moved for summary judgment with
respect to their claims and appellants' counterclaims.

On May 5, 2016, the bankruptcy court granted summary judgment
to the Debtors. Mem. Decision on (I) Mots. for J. on the Pleadings
and (II) Debtors' Omnibus Mot. for Summ. J., HPIP Dkt. 22; Nordheim
Dkt. 20. It concluded, as it had in the course of granting the
Debtors' rejection motion, that neither the HPIP Agreements nor the
Nordheim Agreements contained covenants that run with the land,
either as real covenants or as equitable servitudes. The bankruptcy
court entered a final order authorizing rejection of the Agreements,
as well as final orders in the adversary proceedings, on May 11,
2016. Ch. 11 Dkt. 1082-84; HPIP Dkt. 23; Nordheim Dkt. 22.
Appellants timely filed these appeals on June 2, 2016 and June 17,
2016, respectively, and the appeals were subsequently consolidated.[3]

On appeal, appellants raise three issues: whether the
bankruptcy court erred in (1) deciding that the Agreements did not

---

[3] Each of the appellants filed two notices of appeal – one from an
order in Sabine's Chapter 11 proceeding and one from an order in the
respective appellant's adversary proceeding against Sabine. All four
appeals were consolidated together under the docket number 16-cv-
4127 (JSR). Order dated July 6, 2016, ECF No. 7.

contain real covenants, (2) deciding that the Agreements did not contain equitable servitudes, and (3) allowing the Debtors to reject the Agreements.[4] The Court has jurisdiction over the appeal pursuant to 29 U.S.C. § 158(a)(1).

In a bankruptcy appeal, "[a] district court 'review[s] the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law de novo.'" In re Dreier LLP, 2016 WL 3920358, at *3 (S.D.N.Y. July 15, 2016) (quoting Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006)); see also Fed. R. Bankr. P. 8013.

Under § 365 of the Bankruptcy Code, a debtor in possession, "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a). That provision allows a debtor to reject executory contracts between the debtor and another party if it is in the interest of the debtor's business, notwithstanding any adverse effects on the non-debtor contracting party. See Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993). However, it is not possible for a debtor to reject a covenant that "runs with the land," since such a covenant creates a property interest that is not extinguished through bankruptcy. The parties here agree on the foregoing, and therefore their dispute comes down to whether the

---

[4] Only Nordheim raises this third issue.

Agreements run with the land and therefore cannot be rejected
pursuant to § 365(a).

Appellants first argue that the Agreements run with the land as
real covenants under Texas law, here applicable. In <u>Inwood N.
Homeowners' Ass'n v. Harris</u>, the Supreme Court of Texas set out four
conditions that must be satisfied in order for a covenant to run
with the land:

> In Texas, a covenant runs with the land when it touches and
> concerns the land; relates to a thing in existence or
> specifically binds the parties and their assigns; is intended
> by the original parties to run with the land; and when the
> successor to the burden has notice.

736 S.W.2d 632, 635 (Tex. 1987). At issue here is the first factor,
whether the covenant "touches and concerns the land." In making that
determination, courts in Texas have applied two tests. First, a
covenant touches and concerns the land "if it affect[s] the nature,
quality or value of the thing demised, independently of collateral
circumstances, or if it affect[s] the mode of enjoying it." <u>Westland
Oil Dev. Corp. v. Gulf Oil Corp.</u>, 637 S.W.2d 903, 911 (Tex. 1982).
Second, a covenant touches and concerns the land either "[i]f the
promisor's legal relations in respect to the land in question are
lessened" or "if the promisee's legal relations in respect to that
land are increased." <u>Id.</u> Meeting one of the two tests will satisfy
the "touch and concern" requirement.

Applying the second test first, the Court concludes that
appellants have not shown that the Agreements either increased their
legal relations to the real property interests at issue or decreased

8

Sabine's. Nordheim argues that Sabine's dedication of the gas and condensate that was "produced and saved" in the Nordheim Dedicated Area for gathering by Nordheim conveyed an interest in minerals in the ground, which under Texas law is a property interest. See American Ref. Co. v. Tidal W. Oil Corp., 264 S.W. 335, 338 (Tex. Civ. App. 1924) ("It is settled law in Texas that oil and gas are minerals, and while in place are a part of the realty, and one who acquires an interest in them by proper conveyance has a legal estate and interest in the land under which they are situated."). Nordheim supports this contention with citations to cases featuring the conveyance of a royalty interest in minerals "produced and saved." See, e.g., Miller v. Speed, 248 S.W.2d 250, 256 (Tex. Civ. App. 1952). It reasons that since a royalty interest is undoubtedly a property interest, see Bagby v. Bredthauer, 627 S.W.2d 190, 194 (Tex. Ct. App. 1981) ("A 'royalty interest' . . . is an interest in 'land.'"), and since conveyances of royalty interests refer to minerals produced and saved, then Sabine's dedication of gas and condensate that is "produced and saved" must convey a property interest.

However, even accepting Nordheim's premises, this conclusion does not necessarily follow, since the nature of the interest that Nordheim received is different from a royalty interest. As Nordheim notes in its brief, a royalty interest is "the right to [a] specified proportionate share of production once the minerals are produced," see id., whereas appellants received no right to any

share of the gas and condensate that came from the Dedicated Areas,
but rather were entitled to process those minerals in exchange for a
fee and obligated to re-deliver them to Sabine. American Refining,
upon which Nordheim relies, is distinguishable on this same basis.
In that case, a contract provided that the buyer would purchase all
of a certain type of gas produced from the wells in a particular
area from the time of the contract onward, and the court held that
since the buyer had acquired an interest in the minerals while they
were part of the land, the buyer's interest was in real property.
264 S.W. at 336, 338. Here, in contrast, the appellants have not
purchased the minerals underlying the Dedicated Areas but, again,
have merely agreed to provide services to the minerals' owner. The
logical extension of Nordheim's argument -- that any agreement
relating to minerals in the ground constitutes the conveyance of a
real property interest -- is not supported by the cited caselaw.

Accordingly, appellants cannot show that they have received a
royalty interest in the mineral estate corresponding to the
Dedicated Areas, nor have they received any of the other mineral
rights or interests recognized under Texas law. See Altman v. Blake,
712 S.W.2d 117, 118 (Tex. 1986) (listing those interests as "(1) the
right to develop (the right of ingress and egress), (2) the right to
lease (the executive right), (3) the right to receive bonus
payments, (4) the right to receive delay rentals, (5) the right to
receive royalty payments").

HPIP argues that, by "dedicat[ing]" "the Leases" to the performance of the HPIP Agreements, Sabine implicated some interest in those leases. See HPIP Br., Ex. 1 at § 2.1, ECF No. 11. However, Sabine clearly disclaimed any intention to convey title to the leases. See id. at § 9.3. At oral argument on this appeal, counsel for HPIP both insisted that the dedication of the leases is significant, see Tr. dated Oct. 26, 2016, at 13, and clarified that HPIP's position is not that the leases were conveyed to it, see id. at 21. Given that HPIP does not identify what kind of property interest it might have obtained in the leases from the HPIP Agreements' vague "dedication" of them to Sabine's performance of those agreements, the Court is unable to conclude that HPIP's legal interest in the leases did in fact increase. Therefore, the Court concludes that the Agreements did not increase appellants' real property interests, but rather granted them the merely contractual right to be the exclusive providers of certain services for gas and condensate produced in certain areas.

The Court also concludes that the Agreements did not decrease Sabine's legal relation to its real property interests in the Dedicated Areas. Appellants' arguments that Sabine's interests were burdened by its obligation to deliver all of the gas and condensate it produced to appellants are unsuccessful for multiple reasons. First, as noted above, Sabine did not convey real property interests to appellants. Second, notwithstanding the Agreements, Sabine was free to produce as much or as little gas and condensate from the

Dedicated Areas as it chose. While failing to deliver the minimum
volume set out in the Agreements would require Sabine to make a
deficiency payment, that obligation is merely contractual. Third,
Sabine's obligations under the Agreements are triggered only once
the gas and condensate are produced, at which point those substances
are personal, rather than real, property. See Colorado Interstate
Gas Co. v. Hunt Energy Corp., 47 S.W.3d 1, 10 (Tex. Ct. App. 2000)
("Once oil or gas has been severed from the ground, it becomes
personalty."). Sabine's obligation under the Agreements is simply to
use Nordheim's and HPIP's respective gathering and processing
services when it does produce and deliver gas and condensate, and
that restriction does not limit Sabine's enjoyment of the land
itself.

Appellants rely heavily on the Fifth Circuit's recent decision
in In re Energytec, Inc., which they argue is on point here. 739
F.3d 215, 221 (5th Cir. 2013). In that case, Energytec's predecessor,
Mescalero, agreed to convey its interests in a gas pipeline, its
rights-of-way, and a processing plant to Producers Pipeline
Corporation ("Producers"). At the same time, Mescalero reserved
certain rights for Newco, its subsidiary. Specifically, under the
agreement Producers had to pay Newco a transportation fee based on
the amount of gas flowing through the pipeline, Newco received a
security interest and lien on the pipeline system, and Producers had
to obtain Newco's consent before assigning Producers' interest in
the pipeline. The Fifth Circuit held that the agreement contained

covenants that touched and concerned the land because Newco's
interest pertained to "the use of real property, i.e., the traveling
of natural gas from a starting point along the length of the
pipeline to an endpoint," and because the restriction on the
assignment of the pipeline "impact[ed] the owner's interest in the
pipeline" and "the pipeline's value in the eyes of prospective
buyers." Id. at 224.

Despite some similarities, Energytec is distinguishable from
the case before this Court. Whereas, in Energytec, Newco was
entitled to the transportation fee upon a use of the land in
question, here the obligation to pay a gathering fee is only
incurred upon delivery of produced gas and condensate to appellants.
In addition, the requirement that Newco consent to any assignment of
the use of the pipeline provides a restraint on the owner's right of
alienation that is not present in the Agreements here. While the
HPIP Agreements provide that any subsequent purchaser of Sabine's
interests in the leases covering the HPIP Dedicated Area must assume
Sabine's obligations under those agreements, such a provision merely
equates to another statement that the agreements are enforceable
against Sabine's successors. Thus, while the decision in Energytec
is not binding on this Court in any event, its reasoning does not
compel the conclusion that the Agreements burdened Sabine's real
property interests.

Turning now to the first test for the "touch and concern"
requirement -- whether the covenant "affect[s] the nature, quality

13

or value of the thing demised, independently of collateral
circumstances, or if it affect[s] the mode of enjoying it,"
Westland, 637 S.W.2d at 911 -- the Court concludes that the
Agreements do not have such effects on Sabine's interests. As
discussed above, and contrary to appellants' arguments regarding
this test, the Agreements do not reduce Sabine's ability to make use
of or alienate its real property interests. Nordheim also contends
that the Nordheim Agreements make Sabine's interests "more or less
valuable, depending on the price of hydrocarbons and the market
rates for gathering." Consolidated Br. 14-15. But those factors are
clearly collateral to the terms of the Agreements and would affect
the value of any oil-producing land.

Accordingly, since the Agreements satisfy neither of the
tests set out in Westland, the Court concludes that the Agreements
do not touch and concern the land, and therefore the bankruptcy
court did not err in holding that the Agreements do not run with the
land as real covenants.[5]

Appellants argue in the alternative that the Agreements
constitute equitable servitudes. Under Texas law,

> a covenant that does not technically run with the land can
> still bind successors to the burdened land as an equitable
> servitude if: (1) the successor to the burdened land took its
> interest with notice of the restriction, (2) the covenant
> limits the use of the burdened land, and (3) the covenant
> benefits the land of the party seeking to enforce it.

---

[5] Because the Court finds that the covenants do not meet the touch
and concern requirement, it need not reach the issue of whether a
real covenant under Texas law requires horizontal privity, and, if
so, whether such privity exists here.

14

Reagan Nat'l Advert. of Austin, Inc. v. Capital Outdoors, Inc., 96 S.W.3d 490, 495 (Tex. Ct. App. 2002) (internal citations omitted). Appellants' argument in this regard fails because, as discussed above, the Agreements do not limit Sabine's use of its property interests in the Dedicated Areas. Moreover, the Agreements benefit only appellants, not their land. Through the Agreements, appellants are entitled to receive fees for processing delivered gas and condensate, regardless of where that processing takes place, and thus the Agreements themselves do not render more valuable the land on which appellants have located their processing facilities. Accordingly, the Court concludes that the bankruptcy court did not err in holding that the Agreements did not constitute equitable servitudes.

Finally, given the foregoing conclusions, the Court further finds that the bankruptcy court did not err in authorizing the rejection of the Agreements pursuant to 11 U.S.C. § 365(a). Nordheim challenges that decision only on the ground that the Agreements are real covenants that run with the land, and, since the Court has reached the contrary conclusion, Nordheim's argument in this regard has no merit.

Accordingly, the Court hereby affirms the orders of the bankruptcy court. The Clerk of the Court is hereby directed to close the case.

SO ORDERED.

Dated:    New York, NY
           March 9, 2017

                                                    JED S. RAKOFF, U.S.D.J.

16